ROBERT E. HOWARD et al., Respondents, v B. DOUGLAS LECHER, Appellant.

Second Department, July 30, 1976

*Anthony L. Schiavetti (Michael B. Schad* of counsel), for appellant.

*Julien & Schlesinger, P.C. (Alfred S. Julien* and *Helen B. Stoller* of counsel), for respondents.

TITONE, J. In this medical malpractice action the Special Term denied the defendant's motion to dismiss the first cause of action in which the plaintiffs allege that they suffered mental distress and emotional disturbances as a result of their infant daughter being afflicted with, and eventually dying of, Tay-Sachs, a fatal genetic disease.

The defendant, an obstetrician and gynecologist, first treated plaintiff Laura Howard in March, 1968, and continued to treat her for two pregnancies, through February, 1973. With respect to the child Melisa who eventually died of the disease, the defendant treated and rendered medical services

to the mother from December, 1971 until the date the child was born with the disease, August 21, 1972, and also for a short period thereafter. The child succumbed to the disease on June 26, 1974.

Both in the first cause of action asserted in the plaintiffs' complaint, and in their bill of particulars, they allege that the defendant knew or should have known that, being of Eastern European background, they were potential carriers of Tay-Sachs, and that tests were available both to determine whether they were carriers, and also whether the fetus was afflicted with it. It is further alleged that the defendant was negligent in the treatment of the mother in that he failed, *inter alia,* either to take a proper (genealogical) history of the plaintiffs or to properly evaluate the history that he did take, and that he also failed to advise them of the possibility of the taking of tests of them and of the fetus with regard to the disease. According to the plaintiffs, had they been advised that the fetus had Tay-Sachs, they would have terminated the wife's pregnancy by means of a legal abortion.

Not challenged on appeal is a second cause of action in which the plaintiffs seek damages for moneys expended by them in connection with the child's medical, hospital, nursing and funeral expenses. Thus, the sole issue presented on appeal is whether, under the facts alleged in the first cause of action, damages are recoverable for any emotional harm sustained by the plaintiff parents. The Special Term held that such damages are recoverable in this State. We disagree, and reverse the order under review and grant the motion to dismiss the plaintiffs' first cause of action.

In its decision, the Special Term cited *Johnson v State of New York* (37 NY2d 378), in support of its conclusion that the claim for emotional distress is viable. In *Johnson,* the daughter of a patient in a State hospital received a telegram from the institution which falsely stated that her mother had died. In holding that the daughter could recover for any emotional harm resulting from such mistake, the Court of Appeals pointed out, *inter alia,* that she was not indirectly harmed by an injury caused to another, as in *Tobin v Grossman* (24 NY2d 609), but instead, she was the one to whom a duty was directly owed by the hospital, and the one who was directly injured by the breach of that duty. The same court had earlier held in *Tobin (supra)* that no cause of action lies for an unintended harm sustained by one solely as the result of injuries inflicted

upon another, regardless of the relationship and whether such one was an eyewitness to the accident which resulted in the direct injuries to the third person. In *Tobin* the mother of a child struck by a motor vehicle unsuccessfully sought damages from the tort-feasor for her own mental and physical injuries caused by shock and fear for the child, who suffered serious injuries as a result of the accident.

After a close reading of both *Johnson* and *Tobin* in tandem, we are constrained to the view that the law in this State is that in order for a claimant to recover damages for emotional harm, not only must there be a duty owed the claimant by the tort-feasor, but also the claimant must be the person who is directly injured by the tort-feasor's breach of that duty. While in this case the defendant may or may not have treated the plaintiff wife, or advised her and the plaintiff husband according to accepted medical standards of his profession, the fact is that the injury from which their alleged emotional harm stemmed was suffered by the child. The risk of indirect harm from the loss or injury of loved ones is pervasive and inevitably realized at one time or another. Only a very small part of that risk is brought about by the culpable acts of others. This is the risk of living and bearing children. It is enough that the law establishes liability to those directly or intentionally harmed *(Tobin v Grossman, supra,* p 619; cf. *Hair v County of Monterey,* 45 Cal App 3d 538).

Furthermore, in a similar case *(Stewart v Long Is. Coll. Hosp.,* 35 AD2d 531), this court dismissed a cause of action seeking relief identical to that sought by the plaintiffs herein in their first cause of action. In *Stewart,* the mother had, during the pregnancy, contracted rubella, as a result of which her child was born malformed. The infant plaintiff sued the defendant hospital for its failure to abort her mother and thus terminate her life. The parents also sued, alleging that they had been made to suffer physical pain and mental anguish by virtue of the defendant's failure to perform an abortion. This court, in setting aside a verdict in favor of the parents, stated that the cause of action asserted by the parents, like that of the child, was not one previously known to the law, and, as such, should await legislative sanction and should not be accepted by judicial fiat, citing, *inter alia, Tobin v Grossman (supra).* Our determination was subsequently affirmed by the Court of Appeals (30 NY2d 695). Assuming that the legalization of abortion within 24 weeks from the commencement of a

pregnancy (see Penal Law, § 125.05, subd 3) does give rise to a cause of action for the failure of a physician to inform the parents, *inter alia,* of the fatal consequences to a child born with Tay-Sachs disease, a claim for emotional harm such as that presented here should fail for lack of provable damages.

Suits seeking recovery of damages due solely to the existence of life, or "wrongful life", rather than no life, have not met favor with the courts (see, e.g., *Rieck v Medical Protective Co.,* 64 Wis 2d 514; *Williams v State of New York,* 18 NY2d 481; *Aronoff v Snider,* 292 So 2d 418 [Fla]; 22 ALR3d 1441, 1443). This is especially true where the claimant seeks damages for emotional distress or harm resulting from a "wrongful birth" (see *Stewart v Long Is. Coll. Hosp., supra; Gleitman v Cosgrove,* 49 NJ 22; *Jacobs v Theimer,* 519 SW2d 846 [Tex]).

In order to determine the parents' compensatory damages herein, a court would have to evaluate the denial to them of the intangible, unmeasurable and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional injuries. When the parents say that the child should not have been born, they make it impossible for a court to measure their damages in being the mother and father of a defective child (see *Gleitman v Cosgrove, supra; Jacobs v Theimer, supra).* To elaborate upon what this court stated in *Stewart v Long Is. Coll. Hosp. (supra,* p 532), it is virtually impossible to evaluate as compensatory damages the anguish to the parents of rearing either a malformed child, or a child born with a fatal disease, as against the denial to them of the benefits of parenthood. Damages which are uncertain, contingent or speculative in their nature, cannot be made the basis of a recovery (25 CJS, Damages, § 26).

In addition, recognition of the claim for emotional harm herein would, in my opinion, constitute an unwarranted and dangerous extension of malpractice liability. Under the plaintiffs' theory as to what the law should be, an obstetrician in our ever-expanding heterogeneous and pluralistic society would have an absolute duty to conduct an exhaustive genealogical profile of both parents in order for him to counsel them as to the wisdom of the wife obtaining an abortion. If such should be the law today, then it might follow that tomorrow courts would require a physician to advise parents when extraordinary means of sustaining the vital processes of their child should be terminated (see *Matter of Quinlan,* 70 NJ 10).

Unavoidably, the claim for damages for emotional harm in

this case raises questions of public policy. In my opinion allowance of recovery would place an unreasonable burden upon physicians and obstetricians. It would either open the way for fraudulent claims or enter a field that has no sensible or just stopping point.* Actually, it is a cause based on an after-the-event contingency which plaintiffs make operable by the operations of their minds (cf. *Rieck v Medical Protective Co.,* 64 Wis 2d 415, *supra).*

MARGETT, J. (dissenting). Tay-Sachs disease is an inherited fatal disorder caused by the absence of a vital enzyme which essentially results in the destruction of the nervous system. It is a progressive, degenerative nervous system affliction which invariably causes death prior to the age of five years.[1] On August 21, 1972 the plaintiff Laura Howard gave birth to a female child with this fatal disease. Melisa Howard succumbed to the inevitable effects of Tay-Sachs and died on June 26, 1974, not having reached her second birthday. The plaintiff parents are now looking to the defendant obstetrician who treated Mrs. Howard through gynecological examinations, the pregnancy period and in the obstetric delivery of the deceased child, for damages sounding in medical malpractice, seeking reimbursement for medical expenses and for the pain and anguish in watching their child degenerate and die under the influence of Tay-Sachs. It is alleged that the defendant failed to take an adequate history inasmuch as the plaintiffs were of Jewish, Eastern European background and potential carriers of the disease; failed to administer available tests to determine whether the parents were carriers; and otherwise failed to give proper advice and recommendations with respect to treatment during the pregnancy period. It is averred that had the defendant undertaken the proper medical course, the parents would have been found to be Tay-Sachs carriers and they

---

* An illustration of the lengths to which causes of action arising out of "wrongful birth" may reach if such theory is ever adopted by the courts is set forth in *Cox v Stretton* (77 Misc 2d 155, 156). In *Cox* the wife became pregnant and bore a child subsequent to the performance by the defendant physician of a vasectomy upon her husband. In the action charging the physician with malpractice, a cause of action was interposed on behalf of the two other children of the marriage. It was alleged therein that, as a result of the physician's malpractice, each of the two other children had been and would be deprived "of a portion of the care, affection, training and financial support each would have received except for the birth of their unplanned brother" *(supra,* p 156).

1. Kushnick and Diamond, Mass Screening in New Jersey for Tay-Sachs Gene, 73 J of Med Soc of NJ, pp 303-307.

would have elected to terminate the pregnancy by a eugenic abortion. It is my view that this complaint states a valid cause of action and that the plaintiff parents are entitled to seek damages for mental anguish resulting from the defendant's alleged negligence.

Under classic common-law principles of negligence the plaintiffs should be entitled to establish at trial the customary elements of duty, negligence, proximate cause and damages, and, if those are found, the wrong-doing physician should not be granted immunity which, in effect, allows the injuries to go unredressed. In a malpractice action, " 'the person responsible for the injury must respond for all damages resulting directly from and as a natural consequence of the wrongful act according to common experience and in the usual course of events, whether the damages could or could not have been foreseen by him'" *(Ziemba v Sternberg,* 45 AD2d 230, 231, citing *Steitz v Gifford,* 280 NY 15, 20; *Jacobs v Theimer,* 519 SW2d 846 [Tex]; *Dumer v St. Michael's Hosp.,* 69 Wis 2d 766; *Coleman v Garrison,* 327 A2d 757 [Del]). The defendant's patient had the right to information adequate for her to exercise an informed consent or refusal of the continuation of her pregnancy. As such, Dr. Lecher owed a duty to compile adequate information so that subsequent Tay-Sachs tests could have been conducted. Upon being advised of the results of those tests, Mrs. Howard should have then been given the option to terminate the pregnancy or to proceed to childbirth (see *Jacobs v Theimer, supra; Canterbury v Spence,* 464 F2d 772; *Cobbs v Grant,* 104 Cal Rep 505; see, also, 79 ALR2d 1028).

Tay-Sachs disease was first identified 91 years ago as a progressive mental and motor deterioration with onset in infancy and subsequent fatality in early childhood.[2] At this time there is neither a cure nor a treatment. However, by 1969 Drs. John O'Brien and Shintaro Okada had discovered that a lack of "hex A" in the body's enzymes caused the disease.[3] The following year a team of doctors discovered a process wherein, after blood tests are taken, and positive results found, a small amount of the fluid around the unborn child can be removed in a process called amniocentesis. Upon

---

2. O'Brien, Tay-Sachs Disease: From Enzyme to Prevention, 32 Federation Proceedings, pp 191-199.

3. O'Brien, Okada, Chen and Fillerup, Tay-Sachs Disease: Detection of Heterozygotes and Homozygotes by Serum Hexoramindase Assay, 283 New England J Med, pp 15-20.

testing, the presence or lack of "hex A" can be ascertained.[4] Since the disease is caused by an inherited enzyme deficiency and is predominantly found in the Ashkenazic Jewish population originating in Central and Eastern Europe, only those susceptible Jews need be tested for the presence of Tay-Sachs disease. While the carriers themselves are perfectly normal in all respects, when two carriers produce offspring, there is a high risk that their child will be afflicted with the fatal disease.[5] Thus, it is evident that by 1972 a relatively simple and inexpensive medical procedure had been developed to isolate and identify the irregular enzyme causing the Tay-Sachs.[6] Furthermore, programs involving population screening to detect the suspect enzyme for Tay-Sachs disease in the Jewish population have been conducted in the Baltimore-Washington area, throughout New Jersey, and Toronto, Canada involving many thousands of people.[7] It is because the detection is relatively simple and is limited to an identifiable population group, and because a simple and accurate test is available for diagnosis, that a master screening program to detect the presence of the offending enzyme can be conducted without much difficulty. Moreover, genetic counselling, which involves the communication process between physicians and patients in an attempt to deal with the occurrence or the risk of occurrence of genetic disorders in a family, has become widespread in the last several years.[8] Mrs. Howard, having conceived in late 1971, might therefore have expected her obstetrician, at the minimum, to ascertain the fact of her background and, once having done so, to conduct a serum assay (blood test) and the amniocentesis procedure.

4. Edelson, The Jewish Disease, *New York Daily News,* Nov 9, 1971.

5. Kushnick and Diamond, *supra,* 1; Saifer, Schneck, Perle, Valenti and Volk, Caveats of Antenatal Diagnosis of Tay-Sachs Disease, 115 Am J Obsted Gynecol, pp 553-555; Freidland, Perle, Saifer, Schneck and Volk, Screening For Tay-Sachs Disease *in utero* Using Amniotic Fluid, 135 Proceedings of Soc for Experimental Biology and Medicine, pp 1297-1298.

6. O'Brien, *supra,* 2, p 195. It is estimated that the serum assay will cost $2, the amniocentesis will cost $100, and a therapeutic abortion will cost $350, yet annual hospital and medical costs for caring for the affected infant will vary from $10,000 to $50,000 annually (O'Brien, *supra,* 2, pp 196, 198).

7. Genetics for the Community, *Time Magazine,* Sept 13, 1971, p 54; Loden, Zucker, Wilnensky and Shomorowski, Screening for Carriers of Tay-Sachs Disease: A Community Project, 111 CMA Journal, pp 229-233.

8. Kushnick, When to Refer to the Geneticist, 235 J A M A, p 623; Gordon, Genetic Counselling: Considerations For Talking to Parents and Prospective Parents, 217 J A M A, p 1215.

A tort action can be maintained to recover damages for prenatal injuries negligently inflicted regardless of whether the unborn child was viable or nonviable at the time of the injury, provided that it was born alive (*Endresz v Friedberg,* 24 NY2d 478; *Matter of Peabody [Chase Manhattan Bank-Holtzman],* 5 NY2d 541; *Woods v Lancet,* 303 NY 349; *Liebler v Our Lady of Victory Hosp.,* 43 AD2d 898; *Kelly v Gregory,* 282 App Div 542). Further, physicians have been held answerable in malpractice actions in connection with professional care before or during birth where the child was born with physical or mental defects (*Libby v Conway,* 192 Cal App 2d 865; *Seattle-First Nat. Bank v Rankin,* 59 Wn 2d 288; *Larrabee v United States,* 254 F Supp 613). In the context of the facts alleged here, the liability is fixed at the point when the defendant omitted to utilize the then accepted procedure for screening Tay-Sachs carriers.

In the usual negligence or malpractice case the matter would require no further discussion. However, the issues of whether the plaintiff mother has been directly injured by the defendant's alleged professional negligence, whether the damages resulting therefrom are capable of legal evaluation, and whether the potential use of a therapeutic abortion, in fact, gives rise to an action in "wrongful life" on behalf of the mother, obscure the essentially clear outlines of this negligence action. It is now settled that there may be recovery for injuries sustained solely as the result of an initial mental or psychological impact, if there is ensuing mental or physical injury (see *Johnson v State of New York,* 37 NY2d 378; *Tobin v Grossman,* 24 NY2d 609; *Battalla v State of New York,* 10 NY2d 237; *Ferrara v Galluchio,* 5 NY2d 16). The problem is whether the scope of the duty owed by the obstetrician here flowed directly to the mother or whether her role is more akin to that of a bystander to an accident who witnessed severe physical injury to a third person. In this perspective, it presents a case of first impression in our State. Unlike the interested bystander who witnessed serious injuries to her child (see *Tobin v Grossman, supra),* or the parents who suffered mental anguish when their son was the subject of an unauthorized circumcision (see *Kalina v General Hosp. of City of Syracuse,* 13 NY2d 1023), the duty here was owed directly by the doctor to his patient, although the ultimate physical injury, not caused by the defendant but preventable by him, was inflicted upon a third party. The defendant owes a duty,

in the sense of a potential liability for damages, only with respect to those risks or hazards which may potentially arise (see *Dillon v Legg,* 68 Cal 2d 728). As Judge CARDOZO wrote many years ago: "The risk reasonably to be perceived defines the duty to be obeyed". *(Palsgraf v Long Is. R.R. Co.,* 248 NY 339, 344.) The defendant's obligation turns on whether "the offending conduct foreseeably involved unreasonably great risk of harm to the interests of someone other than the the actor. * * * The obligation to refrain from * * * particular conduct is owed * * * with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails." (2 Harper & James, Law of Torts, p 1018.) Recovery should be permitted if the defendant, in not employing a medically-sanctioned procedure to identify carrier parents, breached a duty, whether or not he could have foreseen the precise consequences of that omission (see *Steitz v Gifford,* 280 NY 15, 20, *supra).* The injury suffered here admittedly was not as directly caused as was the emotional harm suffered by the daughter of a patient in a mental hospital who was erroneously informed that her mother had died (see *Johnson v State of New York,* 37 NY2d 378, *supra),* but is no less direct than the psychological injury precipitated by the psychic trauma which arose when an office worker discovered her superior's suicide (see *Matter of Wolfe v Sibley, Lindsay & Curr Co.,* 36 NY2d 505;[9] cf. *Hopper v United States,* 244 F Supp 314). It cannot be said, therefore, that the causal relation between the original injury and the ultimate damage was so tenuous that the wrongdoer should be freed from liability for the wrong. After all, at the time of the alleged negligence the infant had not yet matured to the status of a viable fetus and the potential mother had the unqualified right to abort the pregnancy (see Penal Law, § 125.05; *Roe v Wade,* 410 US 113).

The harm for which damages are now sought by the mother occurred at the time of the birth of the fatally flawed child, and the effect of that birth, with the ensuing physical deterioration, proximately resulted from the breach of duty arising during pregnancy when there was no such entity as Melisa Howard. Viewed in this light, the "wrongful life" issue is hardly relevant. We are not asking whether the infant would have preferred to choose between life in a handicapped state

---

9. *Wolfe* involved a claim under the Workmen's Compensation Law.

or whether not to have been born at all. By applying classic and time-tested concepts of tort law, we are merely drawing a line from an alleged omission, the result of which caused the plaintiff mother extreme mental anguish and suffering. Since an action in medical malpractice lies by a mother against a physician for his negligent failure to diagnose a pregnancy when she had no further desire to have children (see *Ziemba v Sternberg,* 45 AD2d 230, *supra; Chapman v Schultz,* 47 AD2d 806), similarly, a valid cause is stated here since the medically indicated abortion was merely the means by which the negligent act of the physician could have been corrected (see, also, *Jackson v Anderson,* 230 So 2d 503 [Fla]; *Custodio v Bauer,* 251 Cal App 2d 303; *Troppi v Scarf,* 31 Mich App 240). Stated another way, the abortion is the end product of what should have been one of the options available to the mother if negligence had not intervened. This choice was never given to the infant, could never have been available to the fetus, and now rests solely with the parents, as sanctioned by our Penal Law and the Supreme Court of the United States.

No new duty is created to one who does not sustain any physical impact or fear for his own safety as a result of witnessing injury to a third person (cf. *Tobin v Grossman,* 24 NY2d 609, 613, *supra).* Nor need this court expand a tort concept to include the mother of the Tay-Sachs child. Here, unlike what the Court of Appeals was asked to do in the *Tobin* case, the range of liability need hardly be extended in order to uphold the validity of the cause of action under review. In *Tobin,* the mother did not herself witness the accident though it occurred in her presence and she heard the screech of automobile brakes. Judge (now Chief Judge) BREITEL, in writing for the majority, noted (p 617) that the courts, for the most part, have refused to extend the duty of the negligent actor to cover the mother of the small child. However, unlike the *Tobin* case, where policy considerations caused the court to limit liability, no such limitation exists here. Unlike the eyewitness situation, which provided "no rational practical boundary for liability" (see *Tobin v Grossman, supra,* p 618), the injured plaintiff here was the sole subject of the defendant's treatment and was not an inadvertent, unknown and fortuitous observer. In the absence of this State's former public policy against abortion, there is no longer any compelling reason to inhibit the mother's action

wherein she seeks relief because her physician negligently failed to advise her of the availability of a eugenic abortion.[10]

Of paramount significance here is the fact that the defendant has moved to dismiss the first cause of action sounding in damages for emotional and mental anguish and has not attacked the sufficiency of that branch of the action which seeks reimbursement for medical expenses incurred as a result of the alleged malpractice. Thus, the defendant has impliedly conceded that the sole issue is whether the plaintiffs can establish damages, as a matter of law, for mental pain and suffering. It is this issue that has vexed the courts which have faced similar problems arising out of prenatal negligence (see *Stewart v Long Is. Coll. Hosp.,* 35 AD2d 531, affd 30 NY2d 695; *Greenberg v Kliot,* 47 AD2d 765, mot for lv to app den 37 NY2d 707; *Johnson v Yeshiva Univ.,* 53 AD2d 523; *Gleitman v Cosgrove,* 49 NJ 22). In addressing itself to that issue, the *Gleitman* court wrote *(supra,* pp 29-30):

"A considerable problem is raised by the claim of injury to the parents. In order to determine their compensatory damages a court would have to evaluate the denial to them of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries. Such a proposed weighing is similar to that which we have found impossible to perform for the infant plaintiff. When the parents say their child should not have been born, they make it impossible for a court to measure their damages in being the mother and father of a defective child.

"Denial of the claim for damages by adult parents is also required by a close look at exactly what it is they are here seeking. The thrust of their complaint is that they were denied the opportunity to terminate the life of their child while he was an embryo. Even under our assumption that an abortion could have been obtained without making its participants liable to criminal sanctions, substantial policy reasons prevent this Court from allowing tort damages for the denial of the opportunity to take an embryonic life."

Similarly, this court, in *Stewart v Long Is. Coll. Hosp. (supra),* reasoned that no remedy exists for being born under a

---

10. 55 Minn L Rev 58, 79; see, also, Holtzman, Medical Legal Considerations of Abortion Under the New Abortion Law, 14 Clinical Obstetrics and Gynecology, pp 36-47.

handicap when the only alternative is not to have been born at all. We concluded that no ascertainment of damages was possible because there was no method for placing a value on nonexistence (see, also, *Williams v State of New York,* 18 NY2d 481; *Aronoff v Snider,* 292 So 2d 418 [Fla]; *Zepeda v Zepeda,* 41 Ill App 2d 240; *Jacobs v Theimer,* 519 SW2d 846 [Tex], *supra; Coleman v Garrison,* 327 A2d 757, *supra; Rieck v Medical Protective Co.,* 64 Wis 2d 514). In *Stewart,* the plaintiff mother was a patient in the defendant hospital, having entered there as a result of advice given to her by the family physician, who was concerned that the child would be born with congenital birth defects since the mother had become afflicted with rubella early in pregnancy. Two of the four members of the hospital committee governing abortions were of the opinion that an abortion should be performed. No abortion was performed and, in effect, the plaintiff gave birth to a child who suffered serious mental and physical disabilities. After the trial, the court dismissed the infant's cause of action, but held that the mother could recover for the damages which she had suffered as a result of the hospital's failure to perform an abortion, and that the father could recover for the loss of services of his daughter and for his future obligations for medical treatment. This court, citing *Gleitman,* reversed the latter determinations, holding that no cause of action for "wrongful life" could have been established without legislative fiat and that "it would be virtually impossible to evaluate as compensatory damages the anguish to the parents of rearing a malformed child as against the denial to them of the benefits of parenthood" *(Stewart v Long Is. Coll. Hosp., supra,* p 532).

Leaving aside the question of damages for the moment, the *Stewart* case is quite unlike the case before us. In *Stewart* the parents were aware of the possible danger of rubella to the unborn child and no liability could therefore have been predicated in malpractice. Moreover, the causes of action were not dismissed until proof had been adduced at trial, whereas here it is merely the sufficiency of the complaint which is being tested. As such, all allegations contained in the complaint are deemed to be true for the purposes of this motion (see *Cohn v Lionel Corp.,* 21 NY2d 559, 562). Also, the public policy which at the time of the *Stewart* case condemned the proposed abortion to be an illegal one (see former Penal Law, § 80), is no longer the public policy of our State (see Penal Law, § 125.05; *Roe v Wade,* 410 US 113, *supra).*

Subsequent to the passage of the statute permitting abortions and the decision in *Roe v Wade,* this court dismissed a complaint predicated upon the assertion by a mongoloid infant of his claimed right to have been "well born" *(Greenberg v Kliot,* 47 AD2d 765, mot for lv to app den 37 NY2d 707, *supra).* The second cause of action on behalf of the infant's mother was predicated upon alleged physical and mental damages incurred, as well as the hardship and difficulty of bringing up a mongoloid child. It is significant to note that the motion to dismiss there was addressed solely to the infant's cause of action, and neither the Special Term nor this court ruled on the viability of the mother's prayer for relief. Consequently, since the passage of the legislation permitting abortion, there has been no case in this department which has held that the mother's cause of action for pain and mental anguish is insufficient as a matter of law. Rather, it appears that the judicial thrust on this point favors such a cause (see *Ziemba v Sternberg,* 45 AD2d 230, *supra; Chapman v Schultz,* 47 AD2d 805, *supra).*[11]

The difficulty presented in a "wrongful life" action is that the court is asked to compare the relative valuations of life with defects and the "utter void of nonexistence" (see *Gleitman v Cosgrove,* 49 NJ 22, 28, *supra).* It is contended that such compensation is impossible because there is no method by which one could place a valuation on nonexistence. Moreover, as the *Gleitman* court noted, the "preciousness" of human life outweighs the need for recovery *(supra,* p 31). In this society, which condemns a man who will take his own life, prohibits euthanasia, criticizes capital punishment and appreciates the precious value of a single human life, it is really another matter of public policy which determines whether a court will attempt to ascertain the value of a handicapped life as opposed to mere nonexistence. This is not the situation here for several reasons. Firstly, since *Gleitman* and *Stewart,* the Supreme Court and our Legislature have specifically condoned the right of the potential mother to abort her pregnancy if she so chooses. Moreover, the issue of nonexistence and placing an evaluation thereon is not before

---

11. The First Department, citing the *Stewart* and *Greenberg* cases, has recently granted summary judgment dismissing the first six causes of action of a complaint apparently seeking similar relief, holding that such causes of action are not known to the law and await legislative sanction (see *Johnson v Yeshiva Univ.,* — AD2d —, *supra).*

this court. What is here instead are the essential components of the usual negligence action—duty, cause and effect, proximate cause and damages. While there is, admittedly, difficulty in specifying and ascertaining the damages in mental pain and anguish, it should be no less difficult than the process utilized by our courts in evaluating pain and suffering, damage to reputation, infliction of mental suffering, etc. (see 22 ALR3d 1443). Indeed, several commentators would go further and even attempt to place a value on nonexistence in a "wrongful life" action (see 55 Minn Law Rev 58, 62-67; cf. Tedeschi, On Tort Liability for "Wrongful Life", 1 Israel L Rev 513).

Lastly, and most significantly, we are here concerned with the unique and startling results arising from the birth of a Tay-Sachs child. While not intending to discount the awesome emotional pain necessarily felt by parents of a handicapped child, including the malformed and retarded child born as a result of a rubella or a salmonella infection during pregnancy, the Tay-Sachs child is immediately doomed upon birth to a short and incredibly painful existence. There is presently no hope at all for recovery; nor can there ever be that intermittent moment of parental joy which parents of a mongoloid child must occasionally feel. The Tay-Sachs baby appears well at birth and develops normally for six to eight months and then progressive psychomotor degeneration slowly begins.

"The baby demonstrates progessive decreased awareness of his environment and decreased activity. By 18 months of age, the child is paralyzed and blind, unable to eat, becomes increasingly constipated, and develops decubitus ulcers. He subsequently exhibits frequent convulsions which increase despite anti-convulsant medication. There is progressive head enlargement because of the central nervous system accumulation of the gangliosides.

"The last few years of the child's short existence are spent in a vegetative state and death occurs between the age of 3 and 5 years, with an average life of 40 months. Death is usually due to intercurrent infections, including aspiration pneumonia."[12]

It is evident then that the parents must inevitably suffer terrible mental anguish while caring for and attending to the doomed child, and while participating as witnesses to its

---

12. Kushnick and Diamond, *supra,* 1, p 303.

tragic deterioration and death. The avoidability of parentage of a Tay-Sachs child has been considerably enhanced by the advent of the medical techniques described above. To deny Mrs. Howard the protection of our laws merely because the estimation of her emotional suffering provides the trier of the facts with a difficult chore does not conform to the essential doctrine of liability in tort which holds the wrongdoer to the full extent of his negligent act.

Tay-Sachs disease can be detected in the carrier parents, with a 25% probability that both parent carriers will produce a Tay-Sachs child.[13] Statistics indicate that there is as little as a 10% chance of birth defects due to rubella.[14] Given these statistics, it is not entirely clear whether a physician owes a patient the duty to perform or even advise, an abortion in a rubella case or that the pregnant mother will choose that alternative in order to prevent the *possibility* of a child born with birth defects. However, carrier parents may expect the birth of a Tay-Sachs child. Given this medical background, and recognizing the standard of care required of a physician, which includes the use of the knowledge and skill of an average member of the medical profession practicing in his community, that physician must be held accountable to the full extent of the proximately caused damages resulting from his negligence, no matter how difficult they are to ascertain (see *Pike v Honsinger,* 155 NY 201; *Carpenter v Blake,* 75 NY 12; Prosser, Law of Torts [3d ed], pp 165-168). Another view would merely serve to grant the physician undeserved immunity resulting from his own negligence. The Supreme Court of the United States, faced with a similar problem, noted: "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case,

---

13. Kushnick, *supra,* 8, p 624.

14. Mendle & Short, Maternal Rubella, The Practical Management of a Case, 2 Lancet 373.

which he alone is responsible for making, were otherwise" *(Story Parchment Co. v Paterson Co.,* 282 US 555, 563).

In a California case, the complaint alleged a separate cause of action by the infant's parents for their own mental and physical distress arising from defendant's negligence. The trial court's instructions, which allowed the parents recovery for physical or mental injury sustained in the course of caring for the child and responding to her needs, was upheld by the highest court of that State. However, an instruction which would have permitted recovery for injuries caused to the parents by the mere witnessing of the child's suffering was rejected *(Capelouto v Kaiser Foundation Hosps.,* 7 Cal 3d 889; see, also, *Dillon v Legg,* 68 Cal 2d 728, *supra; Amaya v Home Ice, Fuel & Supply Co.,* 59 Cal 2d 295). In the *Dillon* case, the same court held that a parent may recover for witnessing a child's distress if the parent suffers actual physical injury. Our Court of Appeals has specifically rejected the eyewitness recovery doctrine in *Tobin.* However, the California court's decision is significant in that it allows some measure of recovery for physical or mental injury arising out of the witnessing of an injury to a third person. Since our Court of Appeals has specifically permitted recovery for harm sustained solely as a result of initial negligence caused by psychological trauma in the absence of physical injury *(Johnson v State of New York,* 37 NY2d 378, *supra),* it naturally follows that once that injury is inflicted directly upon the plaintiff, the injured party may seek recourse since she was not a mere eyewitness or bystander to the injury caused to another. Inasmuch as it may be found that Mrs. Howard's injury was directly caused by the obstetrician's breach of duty, it follows that damages are recoverable for her emotional and mental anguish. She was in the "orbit of the duty" for the breach of which the wrongdoer may be held liable (see *Palsgraf v Long Is. R.R. Co.,* 248 NY 339, 343, *supra).* Additionally, the principal reason for denying recovery for emotional harm, the possibility of numerous fictitious claims, is not present here (see *Tobin v Grossman,* 24 NY2d 609, *supra).*

The very nature of the child's condition makes certain that the mother and father will suffer grave emotional harm. In this type of case, the danger of a proliferation of fictitous claims is not present. Mrs. Howard has been damaged by the denial to her of the option to accept or reject a parental relationship with the child. Moreover, Mr. Howard is so

directly concerned in that decision that he has been damaged as well. Despite the genuine difficulty of ascertaining the amount of the injury, the trier of the facts must be permitted to affix the price of the loss of that option. The physician should not be allowed to escape liability on the basis of either his personal scruples or the *legal policy which requires him to inform a patient in other medical contexts* merely because the court feels unequipped to specifically determine the extent of the injury. As noted by one commentator: "Further, the right of the parents to seek a lawful abortion and, if one is available, to make the final moral choice as to whether it is performed should be recognized. If the infant is to endure a life with defects, it must be because that was the moral choice made by his parents and not because they were given no alternative choice due to the negligence or private morality of a physician" (55 Minn Law Rev 58, 80-81, *supra*).

Accordingly, the order of the Special Term denying the defendant's motion to dismiss the first cause of action should be affirmed.

HOPKINS, Acting P. J., and HAWKINS, J., concur with TITONE, J.; MARGETT, J., dissents and votes to affirm the order with an opinion in which DAMIANI, J., concurs.

Order of the Supreme Court, Nassau County, dated January 15, 1976, reversed, on the law, without costs or disbursements, motion granted, and first cause of action dismissed.