[Civ. No. 58192. Second Dist., Div. One. June 11, 1980.]

SHAUNA TAMAR CURLENDER, a Minor, etc.,
Plaintiff and Appellant, v.
BIO-SCIENCE LABORATORIES et al.,
Defendants and Respondents.

**COUNSEL**

Hurley & Grassini and Roland Wrinkle for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, G. Edward Fitzgerald, Gary J. Nevolo, Robert A. Rizzi, Peter J. Arturo, Mary Laura Davis, Dummit & Agajanian, Scott McFall and Craig I. Dummit for Defendants and Respondents.

**OPINION**

**JEFFERSON (Bernard), P. J.**—Plaintiff Shauna Tamar Curlender, a child, by her father, Hyam Curlender, as guardian ad litem, sought damages for personal injury from defendants Bio-Science Laboratories, a corporation, Automated Laboratory Sciences,[1] a corporation, and Jerome Schaffer, M.D.[2] At first, defendants attacked the sufficiency of the third cause of action set forth in the complaint, a cause of action based upon alleged fraud; eventually, however, defendants demurred to the first amended complaint in its entirety on the ground that it had failed to state a cause of action in its entirety. The trial court sustained the demurrers without leave to amend, and an order of dismissal was filed. Plaintiff has appealed from this order of dismissal.

The appeal presents an issue of first impression in California: What remedy, if any, is available in this state to a severely impaired child—genetically defective—born as the result of defendants' negligence in

---

[1] The correct name of which is Automated Laboratory Services.

[2] Dr. Schaffer, named a defendant in the amended complaint, was given an extension of time in which to plead; nothing was filed below on his behalf at the time the case was dismissed. The two medical laboratories are the respondents on this appeal.

conducting certain genetic tests of the child's parents—tests which, if properly done, would have disclosed the high probability that the actual, catastrophic result would occur?

In resolving this important and complex issue, we turn first to the allegations of the amended complaint, one less than artfully drawn considering the far reaching implications—both legal and medical—of the matter. Because of the procedural posture by which this case reaches us, we bear in mind that we must accept as true the factual allegations contained in that pleading. As it was carefully explained in *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732], "[i]n our examination of the complaint we are guided by the well settled principles governing the testing of its sufficiency by demurrer: A demurrer admits all material and issuable facts properly pleaded. [Citations.] However, it does not admit contentions, deductions or conclusions of fact or law alleged therein. [Citations.]"

I

*The Allegations of the Complaint to*
*Establish a "Wrongful-life" Cause*
*of Action in Tort*

The complaint was framed in five causes of action: however, three of these do not concern us here.[3] In the first cause of action against the named defendants, plaintiff Shauna alleged that on January 15, 1977, her parents, Phillis and Hyam Curlender, retained defendant laboratories to administer certain tests designed to reveal whether either of the parents were carriers of genes which would result in the conception and birth of a child with Tay-Sachs disease, medically defined as "amaurotic familial idiocy."[4] The tests on plaintiff's parents were performed on January 21, 1977, and, it was alleged, due to defendants' negligence, "incorrect and inaccurate" information was disseminated to plaintiff's parents concerning their status as carriers.

---

[3] The three included two causes of action alleged against unnamed makers of the tests used by defendants for negligence and because the tests were "defective and unsafe" for their intended purpose; one cause of action was alleged against Dr. Schaffer.

[4] Schmidt's Attorneys' Dictionary of Medicine (1980). There the disease is more particularly described as "[a] familial [hereditary] disease affecting children of various ages, from four months to 12 years. It is characterized by partial or complete loss of vision, mental underdevelopment, softness of the muscles, convulsions, etc. Known as *Tay-Sachs disease, cerebromacular degeneration*, and *Batten-Mayou's disease*." (Italics in original.)

Tay-Sachs is a "fatal progressive degenerative disease of the nervous system which

The complaint did not allege the date of plaintiff's birth, so we do not know whether the parents relied upon the test results in conceiving plaintiff, or, as parents-to-be when the tests were made, relied upon the results in failing to avail themselves of amniocentesis[5] and an abortion.[6] In any event, on May 10, 1978, plaintiff's parents were informed that plaintiff had Tay-Sachs disease.

As the result of the disease, plaintiff Shauna suffers from "mental retardation, susceptibility to other diseases, convulsions, sluggishness, apathy, failure to fix objects with her eyes, inability to take an interest in her surroundings, loss of motor reactions, inability to sit up or hold her head up, loss of weight, muscle atrophy, blindness, pseudobulper palsy, inability to feed orally, decerebrate rigidity and gross physical deformity." It was alleged that Shauna's life expectancy is estimated to be four years. The complaint also contained allegations that plaintiff suffers "pain, physical and emotional distress, fear, anxiety, despair, loss of enjoyment of life, and frustration. . . ."

The complaint sought costs of plaintiff's care as damages and also damages for emotional distress and the deprivation of "72.6 years of her life." In addition, punitive damages of $3 million were sought, on the ground that "[a]t the time that Defendants. . . [tested the parents] Defendants, and each of them, had been expressly informed by the nation's leading authority on Tay-Sachs disease that said test proce-

---

primarily affects the Eastern European Jewish population and their progeny. Only in the circumstance where both parents are carriers will there be a great likelihood of the presence of the disease in the offspring. In 1969, a relatively simple test to reveal carriers was developed, requiring only a blood sample. Parents-to-be, if individually tested and found both to be carriers, could then agree to a second test. Such second test [known as amniocentesis] involved the drawing and testing of amniotic fluid from the sac in which the unborn child rests within the mother. With the information that their child would be born suffering from this fatal disease, parents could make an informed, although difficult, decision as to whether to continue or terminate the pregnancy." (*Howard* v. *Lecher* (1977) 42 N.Y.2d 109 [397 N.Y.S.2d 363, 366, 366 N.E.2d 64] (dissent).)

[5]The procedure is described in footnote 4; its importance lies in the fact that the results of analysis of the fluid may be utilized to determine the presence of genetic defects such as Tay-Sachs in the unborn child.

[6]An abortion undertaken to prevent birth of a genetically defective child is termed "eugenic" while one to prevent harm to the mother-to-be is termed "therapeutic." (*Speck* v. *Finegold* (1979) 268 Pa. Super. Ct. 342 [408 A.2d 496, 499, fn. 4].)

dures were substantially inaccurate and would likely result in disasterous [sic] and catastrophic consequences to the patients, and Defendants knew that said procedures were improper, inadequate and with insufficient controls and that the results of such testing were likely to be inaccurate and that a false negative result would have disasterous [sic] and catastrophic consequences to the Plaintiff, all in conscious disregard of the health, safety and well-being of Plaintiff. . . ."

## II

*Survey of the Decisional Law Relating to*
*Recognition of a Cause of Action for*
*"Wrongful Life" Brought by a Child,*
*Born With Genetic Defects or Born*
*Illegitimately, Against a Physician*
*or Medical Entity for Failure to*
*Diagnose the Condition and Inform*
*the Parents Accordingly*

As indicated, the demurrers to the complaint were sustained without leave to amend.[7] Defendants successfully argued below that plaintiff Shauna, in essence, was seeking damages for negligence which resulted in her birth; the action was thus termed one for *"wrongful life,"* a cause of action which, when brought by the infant so born, has almost universally been barred in various factual contexts by courts in jurisdictions other than California, and has been rejected in this state insofar as damages were sought for an *illegitimate* birth by the infant so born. (*Stills* v. *Gratton* (1976) 55 Cal.App.3d 698 [127 Cal.Rptr. 652].)

The term "wrongful life" has to date served as an umbrella for causes of action based upon many distinguishable factual situations; this has led to some confusion in its use. For purposes of our discussion, the term "wrongful life" will be confined to those causes of action *brought by the infant* alleging that, due to the negligence of the defendant, birth occurred; this would include the healthy baby boy involved in *Stills, supra*, as well as the genetically and severely impaired plaintiff, Shauna, in the case at bench.

In our discussion, we do not intend to make reference, in any exhaustive way, to the decisional law concerning parental causes of action,

---

[7]We are informed through the briefs of the parties that plaintiff's parents are prosecuting a separate action for their damages arising from defendants' negligence, a matter now awaiting trial in the Los Angeles Superior Court.

except where it appears to have some significance herein. (For a more generally oriented collection of cases, see Annot., Tort Liability for Wrongfully Causing One To Be Born (1978) 83 A.L.R.3d 15, 29, and an excellent analysis in *Speck* v. *Finegold, supra,* [408 A.2d 496] *ante,* footnote 6, of the case law that has developed in the last 50 years.

The term "wrongful life" appeared in 1963 in an Illinois appellate court opinion. (*Zepeda* v. *Zepeda* (1963) 41 Ill.App.2d 240 [190 N.E.2d 849] cert. den. 379 U.S. 945 [13 L.Ed.2d 545, 85 S.Ct. 444].) There the court denied recovery to an infant plaintiff who claimed that his defendant father had injured him by causing him to be born illegitimately. The Illinois court declined to equate illegitimate birth with injury deemed actionable at law in our society. It declared that "[r]ecognition of the plaintiff's claim means creation of a new tort: a cause of action for *wrongful life.* The legal implications of such a tort are vast, the social impact could be staggering. If the new litigation were confined just to illegitimates, it would be formidable." (*Zepeda, supra,* 190 N.E.2d 849, 858.) (Italics added.)

The *Zepeda* holding was followed in *Williams* v. *State* (1966) 18 N.Y.2d 481 [276 N.Y.S.2d 885, 223 N.E.2d 343]. In *Williams,* plaintiff's mentally deficient mother was raped while in a state mental institution, under circumstances giving rise to the claim that the rape had been the proximate result of the institution's negligence with plaintiff's illegitimate birth a consequence. The New York court observed that "[b]eing born under one set of circumstances rather than another or to one pair of parents rather than another is not a suable wrong that is cognizable in court." (*Williams, supra,* 276 N.Y.S.2d 885, 887.)

A major (and much cited) opinion considering a claim for damages by an impaired infant plaintiff and his parents is *Gleitman* v. *Cosgrove* (1967) 49 N.J. 22 [227 A.2d 689, 22 A.L.R.3d 1411] from the New Jersey Supreme Court. The Gleitmans brought a malpractice action against Mrs. Gleitman's physician for damages because the Gleitman child, Jeffrey, had been born with serious impairments of sight, speech, and hearing. Mrs. Gleitman had contracted rubella (measles) during the first trimester of pregnancy (the first three months). Defendant was made aware of this fact, but failed to inform the mother-to-be of any potentially harmful consequences to her child; Mrs. Gleitman was assured by him that such consequences would not occur, although it was common medical knowledge that rubella, contracted during early preg-

nancy, often causes the type of defects suffered by Jeffrey, who was also mentally retarded.

The majority of the *Gleitman* court barred recovery by *either* the parents or the child on two grounds: (1) the perceived impossibility of computing damages and (2) public policy. With respect to the computation of damages, the court explained that "[t]he normal measure of damages in tort actions is compensatory. Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence. The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination. This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies." (*Gleitman, supra*, 227 A.2d 689, 692.)

Any decision negating the value of life directly or by implication was seen by the majority in *Gleitman* as an impermissible expression of public policy. There was considerable discussion of the legality of any abortion which would have been undertaken to prevent Jeffrey's birth. The majority referred with approval to the analysis presented in 1 Israel L. Rev. 513 (1966) by Tedeschi, entitled *On Tort Liability for "Wrongful Life."*

A vastly different view was expressed by a dissenting opinion in *Gleitman*. It was there declared that the majority "permits a wrong with serious consequential injury to go wholly unredressed. That provides no deterrent to professional irresponsibility and is neither just nor compatible with expanding principles of liability in the field of torts." (*Gleitman, supra*, 227 A.2d 689, 703 (dis. opn).) As to the impossibility of computing damages, reference was made to a statement by the United States Supreme Court in *Story Parchment Co.* v. *Paterson Co.* (1931) 282 U.S. 555, 563 [75 L.Ed. 544, 548, 51 S.Ct. 248], that difficulties encountered in computing damages cannot be permitted to justify a denial of liability. However, the reasoning and result in *Gleitman's* majority opinion have been, in the main, followed (albeit blindly in our opinion) in other jurisdictions. (See *Stewart* v. *Long Island College Hospital* (1968) 58 Misc.2d 432 [296 N.Y.S.2d 41] and *Dumer* v.

*St. Michael's Hospital* (1975) 69 Wis.2d 766 [233 N.W.2d 372].) It has also been analyzed and criticized. (See Note (1970) 55 Minn. L.Rev. 58.)

Of some significance with respect to this question is the fact that in 1973, *Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705], was decided by the United States Supreme Court. The nation's high court determined that parents have a *constitutionally protected right* to obtain an abortion during the first trimester of pregnancy, free of state interference. We deem this decision to be of considerable importance in defining the parameters of "wrongful-life" litigation.

The *Roe* v. *Wade* case played a rather substantial part in the partial retreat from the *Gleitman* holding by the New Jersey Supreme Court majority in *Berman* v. *Allan* (1979) 80 N.J. 421 [404 A.2d 8]. The Bermans, parents and child, brought suit for medical malpractice. Mrs. Berman had become pregnant in her late 30's, a circumstance involving a substantial risk that the child would be born with Down's syndrome (mongolism), one of the major characteristics of which is mental retardation. Sharon Berman, the child, was so afflicted. Amniocentesis—by that time a well established technique for discerning birth defects *in utero*—had not been suggested to the Bermans. The majority in the *Berman* court held that the *parents* had stated a cause of action, and that they could recover damages for emotional distress, but that lifetime support for Sharon could not be awarded.

But the *Berman* court rejected the concept that the infant Sharon possessed an independent cause of action. Referring to the difficulty of measuring damages in such a case, the court declared that "[n]onetheless, were the *measure* of damages our sole concern, it is possible that some judicial remedy could be fashioned which would redress plaintiff, if only in part, for injuries suffered." Here, the majority chose to rely on public policy considerations. The *Berman* court considered that Sharon had not suffered any damage cognizable at law by being brought into existence. It was explained that "[o]ne of the most deeply held ,beliefs of our society is that life—whether experienced with or without a major physical handicap—is more precious than non-life. . . . Sharon, by virtue of her birth, will be able to love and be loved and to experience happiness and pleasure—emotions which are truly the essence of life and which are far more valuable than the suffering she may endure. To rule otherwise would require us to disavow the basic

assumption upon which our society is based. This we cannot do." (*Berman, supra*, 404 A.2d 8, 12-13.)

The dissenting opinion in *Berman*, noting that the majority had in effect partially overruled *Gleitman*, urged complete rejection of the majority view on the ground that "[t]he child. . was owed directly, during its gestation, a duty of reasonable care from the same physicians who undertook to care for its mother—then expectant—and that duty, to render complete and competent medical advice, was seriously breached." (*Berman, supra*, 404 A.2d 8, 15 (dis. opn).) Taking cognizance of the present legality of abortions in the first trimester, the dissent perceived a duty on the part of medical practitioners to ensure that, under certain circumstances, parents-to-be had the opportunity to decide the future of their child—its existence or nonexistence. "To be denied the opportunity—indeed, the right—to apply one's own moral values in reaching that decision [concerning the child's future], is a serious, irreversible wrong." (*Id.* at p. 18.)

The dissenting opinion in *Berman* expressed the cogent observation that, as for the child, "[a]n adequate comprehension of the infant's claims under these circumstances *starts with the realization that the infant has come into this world and is here*, encumbered by an injury attributable to the malpractice of the doctors." (*Berman, supra*, 404 A.2d 8, 19.) (Italics added.)

In New York, following the advent of *Williams, supra*, 276 N.Y.S.2d 885, there have been a series of decisions wrestling with "wrongful-life" problems with the quite predictable divergent expressions by the judiciary. In only one case, however (overruled by a higher court) did the court grant recognition to a cause of action by a child so born.

In *Park* v. *Chessin* (1977) 60 App.Div.2d 80 [400 N.Y.S.2d 110], an intermediate New York appellate court considered the following facts. The Parks had had one child born with polycystic kidney disease, a fatal hereditary ailment. The baby died. The parents consulted defendant doctors and informed them of this; assured that the condition would not reoccur, the Parks had a second child, who also had the disease but survived for a short life span of two and one-half years. The court held that these facts gave both the parents and child causes of action, that "decisional law must keep pace with expanding technological, economic and social change. Inherent in the abolition of the statutory ban on

abortion...is a public policy consideration which gives potential parents the right, within certain statutory and case law limitations, *not* to have a child. This right extends to instances in which it can be determined with reasonable medical certainty that the child would be born deformed. *The breach of this right may also be said to be tortious to the fundamental right of a child to be born as a whole, functional human being.*" (*Park, supra*, 400 N.Y.S.2d 110, 114.) (Italics added.)

But this view of the law also had a short life span. This decision was reviewed in *Becker* v. *Schwartz* (1978) 46 N.Y.2d 401 [413 N.Y.S.2d 895, 386 N.E.2d 807] (as a companion case) and overruled. The Beckers and their mongoloid infant sought damages from medical doctors who had not, despite the mother's age when she became pregnant, warned of the danger or informed the Beckers of amniocentesis. The parents, declared *Becker*, had stated a cause of action and could recover their pecuniary loss but *not* damages for emotional distress, as the latter recovery would offend public policy. The infant plaintiffs in both *Becker* and *Park* were held to be barred from recovery because of the inability of the law to make a comparison between human existence with handicaps and no life at all. The court particularly rejected the idea that a child may expect life without deformity: "There is no precedent for recognition at the Appellate Division of 'the fundamental right of a child to be born as a whole, functional human being'...." (*Becker, supra*, 413 N.Y.S.2d 895, 900.)

The high court in Pennsylvania issued an exhaustive opinion in 1979 concerning the various aspects of the "wrongful-life" problem. The case was *Speck* v. *Finegold* (1979) 268 Pa. Super. Ct. 342 [408 A.2d 496], a malpractice suit by parents and child occasioned by the birth of the child with neurofibromatosis, a seriously crippling condition already evidenced in the child's siblings. Overruling the trial court, *Speck* recognized the parents' cause of action but not that of the infant plaintiff.

We quote at length from the *Speck* court's opinion: "In the instant case, we deny Francine's [infant plaintiff] claim to be made whole. When we examine Francine's claim, we find regardless of whether her claim is based on 'wrongful life' or otherwise, there is a failure to state a legally cognizable cause of action even though, admittedly, the defendants' actions of negligence were the proximate cause of her defective birth. Her claims to be made whole have two fatal weaknesses. First, there is no precedent in appellate judicial pronouncements that holds a

child has a fundamental right to be born as a whole, functional human being. Whether it is better to have never been born at all rather than to have been born with serious mental defects is a mystery more properly left to the philosophers and theologians, a mystery which would lead us into the field of metaphysics, beyond the realm of our understanding or ability to solve....[This] cause of action...demands a calculation of damages dependent on a comparison between Hobson's choice of life in an impaired state and nonexistence. This the law is incapable of doing. [Fn. omitted.]...unfortunately,...this is not an action cognizable in law. Thus, the recognized principle, not peculiar to traditional tort law alone, that it would be a denial of justice to deny all relief where a wrong is of such a nature as to preclude certain ascertained damages, is inapposite and inapplicable here." (*Speck, supra*, 408 A.2d 496, 508.)

Other jurisdictions, following the lead of the New Jersey and New York cases, have rejected the concept of an infant's cause of action for "wrongful life." (See *Elliott* v. *Brown* (Ala. 1978) 361 So.2d 546, rejecting the "wrongful life" cause of action in that jurisdiction; see also *Jacobs* v. *Theimer* (Tex. 1975) 519 S.W.2d 846, holding that the mother of a defective child had stated a cause of action for failure of the defendant physician to diagnose rubella during early pregnancy and counsel accordingly; also, recovery was allowed for those costs reasonably related to caring for the child's physical defects. The court declared that "[n]o public policy obstacle should be interposed to that recovery." (519 S.W.2d 846, 849).)

Two decisions of note have involved Tay-Sachs impairment—the condition involved in the case before us. In *Howard* v. *Lecher* (1977) 42 N.Y.2d 109 [397 N.Y.S.2d 363, 366 N.E.2d 64] an intermediate appellate court in New York considered an action brought by the parents to recover damages for emotional distress from the consulting physicians. In *Howard*, the child died. Denying recovery, the *Howard* majority reasoned that recognition of the parents' cause of action "would require the extension of traditional tort concepts beyond manageable bounds." (397 N.Y.S.2d at p. 364.)

A dissenting judge in *Howard* expostulated that the issue was simply whether a patient and parent-to-be, the mother, may recover damages from her physician for the latter's negligence. He found it not unreasonable, given the present state of medical knowledge concerning genetically caused birth deformities and the procedures available for

avoiding such deformities, for the law to require an attending physician to take a genealogical history of the parents, to perform any available appropriate tests indicated by such history, and inform the parents of any potential dangers so that they would be able to make an informed decision concerning continuation of pregnancy.[8]

In *Gildiner v. Thomas Jefferson Univ. Hospital* (E.D.Penn. 1978) 451 F.Supp. 692, the parents had been tested for Tay-Sachs; the tests indicated that amniocentesis should be performed; it was performed, but negligently; the parents were both carriers, and the infant born to them suffered from Tay-Sachs. Relying on *Gleitman v. Cosgrove, supra,* 49 N.J. 22, the federal district court held that the parents could recover damages, but the child could not. A strong public policy was perceived in allowing parental recovery: "Tay-Sachs disease can be prevented only by accurate genetic testing combined with the right of parents to abort afflicted fetuses within appropriate time limitations. [¶] *Society has an interest in insuring that genetic testing is properly performed and interpreted.*" (*Gildiner, supra,* 451 F.Supp. 692, 696.) (Italics added.)

We now turn our attention to the California decisional law. Insofar as we have been able to discover, the only California case that has considered the claim of an infant plaintiff to recover for "wrongful life" is *Stills v. Gratton* (1976) 55 Cal.App.3d 698 [127 Cal.Rptr. 652]. *Stills* involved a medical malpractice action brought by both mother and child. The child's claim was for damages purportedly sustained because of his illegitimate birth, following a negligently performed abortion. The court upheld the mother's right to recover damages; there was a lengthy analysis of the differing points of view concerning measurement of her damages. The court concluded that the mother could recover "all the damages to which she is entitled under ordinary tort principles. Under those same principles the defendants may prove any offsets for benefits conferred and amounts chargeable to a plaintiff under her duty to mitigate damages." (*Id.* at p. 709.)

Relying on the illegitimacy cases from other jurisdictions, *Zepeda* (41 Ill.App.2d 240) and *Williams* (276 N.Y.S.2d 885), the *Stills* court

---

[8] A view reiterated in *Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling* (1978) 87 Yale L. J. 1488. That article noted that in the *Howard* case, certain costs (funeral expenses and medical care) were awarded plaintiffs at the trial level, and those awards were not even appealed.

denied recognition to the infant's cause of action by using the rationale of the inability to measure compensation.

## III

### *Invalidity of the Public-policy and Inability-to-measure-damages Arguments Against Recognition of a Child's "Wrongful-life" Cause of Action*

From our analysis and study, we conclude that certain general observations are appropriate concerning the decisional law in this country to date with respect to the "wrongful-life" problem.

*First.* For clear analysis it is important to recognize certain distinctions among the cases purportedly dealing with the "wrongful-life" concept. One such distinction is that concerning the condition of the child involved. Surely there is a world of difference between an unwanted healthy child who is illegitimate (*Stills v. Gratton, supra*, 55 Cal.App.3d 698), the unwanted 10th child of a marriage (*Custodio v. Bauer* (1967) 251 Cal.App.2d 303 [59 Cal.Rptr. 463, 27 A.L.R.3d 884]) and the severely deformed infant plaintiff, Shauna, in the case at bench. Illegitimacy is a status which may or may not prove to be a hindrance to one so born, depending on a multitude of other facts; it cannot be disputed that in present society such a circumstance, both socially and legally, no longer need present an overwhelming obstacle. The same is true for the simply unwanted child. We agree with the reasoning of *Zepeda* and *Stills* that a cause of action based upon impairment of status—illegitimacy contrasted with legitimacy—should not be recognizable at law *because* a necessary element for the establishment of any cause of action in tort is missing, *injury* and damages consequential to that injury. A child born with severe impairment, however, presents an entirely different situation because the necessary element of *injury* is present.

*Second.* The decisional law of other jurisdictions, while not dispositive of Shauna's claim pursuant to California law, is of considerable significance in defining the basic issues underlying the true "wrongful-life" action—one brought by the infant whose painful existence is a direct and proximate result of negligence by others. That decisional law demonstrates some measure of progression in our law. Confronted with

the fact that the births of these infants may be directly traced to the negligent conduct of others, and that the result of that negligence is palpable injury, involving not only pecuniary loss but untold anguish on the part of all concerned, the courts in our sister states have progressed from a stance of barring all recovery to a recognition that, at least, the parents of such a child may state a cause of action founded on negligence.

We note that there has been a gradual retreat from the position of accepting "impossibility of measuring damages" as the sole ground for barring the infant's right of recovery, although the courts continue to express divergent views on how the parents' damages should be measured, in terms of allowing recovery for both pecuniary loss and damages for emotional distress, or, in recognizing one element of recovery only, but not the other.

The concept of public policy has played an important role in this developing field of law. Public policy, as perceived by most courts, has been utilized as the basis for denying recovery; in some fashion, a deeply held belief in the sanctity of life has compelled some courts to deny recovery to those among us who have been born with serious impairment. But the dissents, written along the way, demonstrate that there is not universal acceptance of the notion that "metaphysics" or "religious beliefs," rather than law, should govern the situation; the dissents have emphasized that considerations of public policy should include regard for social welfare as affected by careful genetic counseling and medical procedures.

We have alluded to the monumental implications of *Roe* v. *Wade, supra*, 410 U.S. 113, one of which is the present legality of, and availability of, eugenic abortion in the proper case. Another factor of substantial proportions in "wrongful-life" litigation is the dramatic increase, in the last few decades, of the medical knowledge and skill needed to avoid genetic disaster. As the author of the article in the Yale Law Journal points out (see fn. 8): "Genetic defects represent an increasingly large part of the overall national health care burden." (87 Yale L.J. 1496.) The writer concluded that the law indeed has an appropriate function in encouraging adequate and careful medical practice in the field of genetic counseling, observing that "[t]ort law, a well-recognized means of regulating the practice of medicine, can be used both to establish and to limit the duty of physicians to fulfill this [genetic counseling] function." (87 Yale L.J. 1499.)

*Third.* Despite the cool reception accorded such "wrongful-life" litigation, both parents and their children have continued to seek redress for the wrongs committed, presumably for a number of reasons: (1) the serious nature of the wrong; (2) increasing sophistication as to the causes, which may not with present knowledge be attributed to the fine hand of providence but rather to lack of care; and (3) the understanding that the law reflects, perhaps later than sooner, basic changes in the way society views such matters.

IV

*Recognition in California Law of a Child's
Cause of Action for "Wrongful Life," With
the Scope of Damages Defined,
Including Punitive Damages*

We turn finally to consider plaintiff Shauna's cause of action within the context of principles of tort law well established in this state. It is to the credit of this state that our highest court has, when expansion of tort liability is indicated, emphasized the flexible nature of judicially created common law and the assistance provided by analysis of previous decisions, whether of California courts or courts in other jurisdictions in defining the issues, identifying trends and, on occasion, detecting the winds of change. (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal. 3d 382, 392-394 [115 Cal.Rptr. 765, 525 P.2d 669].)

In California, "'[a]ll persons are required to use ordinary care to prevent others being injured as the result of their conduct.'" (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) *Rowland* explained that "[a] departure from this fundamental principle involves the balancing of a number of considerations; the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Id.* at pp. 112-113.)

Both *Rowland* and *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal. Rptr. 72, 441 P.2d 911, 29 A.L.R.3d 1316], involved redefinition of the

parameters of *duty* under California law,[9] duty being the necessary preliminary element which must be established before liability may be imposed. In both of these cases our high court undertook the task at hand with a manifest and unequivocal understanding of the utmost importance of public policy considerations in reaching a just result. In *Dillon*, for example, reference was made to the rejection in other jurisdictions of liability of a defendant to third persons for their distress at harm visited upon near relatives in the following terms: "Duty [other jurisdictions state] must express public policy; the imposition of duty here would work disaster because it would invite fraudulent claims and it would involve the courts in the hopeless task of defining the extent of the tortfeasor's liability. In substance, they say, definition of liability being impossible, denial of liability is the only realistic alternative. [¶] We have concluded that neither of the feared dangers excuses the frustration of the natural justice upon which the [plaintiff's] claim rests." (*Dillon, supra,* 68 Cal.2d 728, 730-731.)

■ With these pristine principles in mind, we assess the cause of action of Shauna, the defectively born plaintiff. We have no difficulty in ascertaining and finding the existence of a duty owed by medical laboratories engaged in genetic testing to parents and their as yet unborn children to use ordinary care in administration of available tests for the purpose of providing information concerning potential genetic defects in the unborn. The public policy considerations with respect to the individuals involved and to society as a whole dictate recognition of such a duty, and it is of significance that in no decision that has come to our attention which has dealt with the "wrongful-life" concept has it been suggested that public policy considerations negate the existence of such a duty. Nor have other jurisdictions had any difficulty in finding a breach of duty under appropriate circumstances or in finding the existence of the requisite proximate causal link between the breach and the claimed injury; we find no bar to a holding that the defendants owed a duty to the child plaintiff before us and breached that duty.

■ The real crux of the problem is whether the breach of duty was the proximate cause of *an injury cognizable at law*. The injury, of course, is not the particular defect with which a plaintiff is afflicted—

---

[9]The basic elements required for an action in tort are similar to those required elsewhere; a plaintiff must establish that a duty to use care was owed plaintiff by defendant; that the duty owed was breached; that the breach was a proximate cause of harm to plaintiff; and that plaintiff was in fact damaged. See, generally, 4 Witkin, Summary of California Law (8th ed. 1974) Torts.

considered in the abstract—but it is the birth of plaintiff with such defect.

The circumstance that the birth and injury have come hand in hand has caused other courts to deal with the problem by barring recovery. The reality of the "wrongful-life" concept is that such a plaintiff both *exists* and *suffers*, due to the negligence of others. It is neither necessary nor just to retreat into meditation on the mysteries of life. We need not be concerned with the fact that had defendants not been negligent, the plaintiff might not have come into existence at all. The certainty of genetic impairment is no longer a mystery. In addition, a reverent appreciation of life compels recognition that plaintiff, however impaired she may be, has come into existence as a living person with certain rights.

One of the fears expressed in the decisional law is that, once it is determined that such infants have rights cognizable at law, nothing would prevent such a plaintiff from bringing suit against its own parents for allowing plaintiff to be born. In our view, the fear is groundless. ■ The "wrongful-life" cause of action with which we are concerned is based upon negligently caused failure by someone under a duty to do so to inform the prospective parents of facts needed by them to make a conscious choice *not* to become parents. If a case arose where, despite due care by the medical profession in transmitting the necessary warnings, parents made a conscious choice to proceed with a pregnancy, with full knowledge that a seriously impaired infant would be born, that conscious choice would provide an intervening act of proximate cause to preclude liability insofar as defendants other than the parents were concerned. ■ Under such circumstances, we see no sound public policy which should protect those parents from being answerable for the pain, suffering and misery which they have wrought upon their offspring.

In our consideration of whether the child plaintiff has stated a cause of action, we find it instructive to look first to the statutory law of this state. Our Civil Code section 3281 provides that "[e]*very person* who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." Civil Code section 3282 defines detriment as "a loss or harm suffered in person or property." Civil Code section 3333 provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this

Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

 In addition, we have long adhered to the principle that there should be a remedy for every wrong committed. "Fundamental in our jurisprudence is the principle that for every wrong there is a remedy and that an injured party should be compensated for all damage proximately caused by the wrongdoer. Although we recognize exceptions from these fundamental principles, no departure should be sanctioned unless there is a strong necessity therefor. [¶] The general rule of damages in tort is that the injured party may recover for all detriment caused whether it could have been anticipated or not." (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 433 [58 Cal.Rptr. 13, 426 P.2d 173].)

 We have concluded that it is clearly consistent with the applicable principles of the statutory and decisional tort law in this state to recognize a cause of action stated by plaintiff against the defendants. To do otherwise would negate and run counter to the course of tort law so nobly chartered and enunciated in the landmark cases such as *Dillon* v. *Legg, Rowland* v. *Christian, Crisci* v. *Security Ins. Co.*, and *Rodriguez* v. *Bethlehem Steel Corp.*, all *supra.*

The extent of recovery, however, is subject to certain limitations due to the nature of the tort involved. While ordinarily a defendant is liable for all consequences flowing from the injury (*Custodio* v. *Bauer, supra*, 251 Cal.App.2d 303), it is appropriate in the case before us to tailor the elements of recovery, taking into account the particular circumstances involved (as was done in *Stills* v. *Gratton, supra*, 55 Cal.App.3d 698).

The complaint seeks damages based upon an actuarial life expectancy of plaintiff of more than 70 years—the life expectancy if plaintiff had been born without the Tay-Sachs disease. The complaint sets forth that plaintiff's actual life expectancy, because of the disease, is only four years. We reject as untenable the claim that plaintiff is entitled to damages as if plaintiff had been born without defects and would have had a normal life expectancy. Plaintiff's right to damages must be considered on the basis of plaintiff's mental and physical condition at birth and her expected condition during the short life span (four years according to the complaint) anticipated for one with her impaired condition. In similar fashion, we reject the notion that a "wrongful-life" cause of action

involves any attempted evaluation of a claimed right *not* to be born. In essence, we construe the "wrongful-life" cause of action by the defective child as the right of such child to recover damages for the pain and suffering to be endured during the limited life span available to such a child and any special pecuniary loss resulting from the impaired condition.

■ In California, infants are presumed to experience pain and suffering when injury has been established, even if the infant is unable to testify and describe such pain and suffering. In *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889 [103 Cal.Rptr. 856, 500 P.2d 880], the trial court had failed to instruct the jury on the infant plaintiff's pain and suffering; our high court reversed the jury verdict that awarded only plaintiff's medical expenses. It was observed, with respect to pain and suffering, that "[a]dmittedly these terms refer to subjective states, representing a detriment which can be translated into monetary loss only with great difficulty. [Citation.] But the detriment, nevertheless, is a genuine one that requires compensation [citations], and the issue generally must be resolved by the 'impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence.'" (*Id.* at p. 893.)

■ The complaint sought costs of care as an element of special damages, an appropriate item of recovery in cases where, for one reason or another, there is no suit brought by the parents seeking recovery for this pecuniary loss. We are informed, however, that such a suit is pending by the parents of the plaintiff before us. Upon remand, consideration should be given to consolidating plaintiff's cause of action with those of the parents in the interest of efficient use of trial time and the prevention of duplication of effort, as well as the prevention of possible double recovery. Costs of plaintiff's care may only be awarded once.

■ Finally, we consider the matter of punitive damages. The complaint makes such a request. Our Civil Code section 3294 allows such damages "where the defendant has been guilty of oppression, fraud, or malice, express or implied"; they are given "for the sake of example and by way of punishing the defendant." We need not speculate on the means by which plaintiff plans to establish facts showing oppression, fraud or malice—as related to either the third cause of action stated in the complaint or the entitlement of plaintiff to punitive damages. Such will be the concern of judge and jury when this matter is tried. For our

purposes, we find that plaintiff has adequately pleaded a cause of action for punitive damages. We see no reason in public policy or legal analysis for exempting from liability for punitive damages a defendant who is sued for committing a "wrongful-life" tort.

The judgment (order of dismissal) is reversed.

Lillie, J., and Rimerman, J.,* concurred.

A petition for a rehearing was denied June 27, 1980, and respondents' petitions for a hearing by the Supreme Court were denied September 4, 1980. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petitions should be granted.

---

*Assigned by the Chairperson of the Judicial Council.