STEVEN M. PARK et al., Individually and as Administrators of the Estate of LARA E. PARK, Deceased, Respondents, v HERBERT CHESSIN et al., Appellants.

Second Department, December 11, 1977

**APPEARANCES OF COUNSEL**

*Martin, Clearwater & Bell (Peter E. Tangredi* and *Stephen J. Pribula* of counsel), for appellants.

*Toberoff & Gould* for respondents.

**OPINION OF THE COURT**

DAMIANI, J.

At the outset, the general rule should be noted that if a motion to dismiss for failure to state a cause of action (CPLR 3211, subd [a], par 7) is addressed to the complaint in its

entirety, the validity of any single cause of action will suffice as a ground for denial of the motion (see, e.g., *De Maria v Josephs,* 41 AD2d 655). However, inasmuch as the plaintiffs have failed to appeal from the dismissal of four causes of action asserted in their complaint, the general rule is not applicable in this case.

In June, 1969 plaintiff Hetty Park gave birth to a baby who lived for only five hours. The cause of death was determined to be polycystic kidney disease, a fatal hereditary disease of such nature that there exists a substantial probability that any future baby of the same parents will be born with it. The plaintiffs allege that immediately after the death of this infant, delivered by the defendant obstetricians, they affirmatively sought out the medical counseling of the defendants involving the risk if any to a child to be born to them and whether it would be afflicted with polycystic kidney disease.

Plaintiffs contend in their amended complaint and bill of particulars, that, in response to their inquiries, the defendants, in wanton and gross disregard of known medical fact, gave them the medically inaccurate advice that the chances of having any future baby with polycystic kidney disease were "practically nil" inasmuch as the disease was not hereditary; that the defendants knew or should have known that the disease was hereditary; that the defendants knew that the plaintiffs would rely on the superior knowledge and medical expertise of the defendants in deciding whether to have another child, and would not have chosen to have another baby had medically accurate advice been rendered; and that the plaintiffs did in fact rely on the assurance and advice of the defendants so that the female plaintiff again became pregnant and had another baby (Lara Park), which was also delivered by the defendants, in July, 1970, and which, too, was born with polycystic kidney disease and that Lara lived for about two and one-half years before succumbing to this fatal disease.

Thereafter, in April, 1972, plaintiffs commenced this action, in the name of the infant to recover damages for so-called "wrongful life" and on their own behalf for medical expenses, emotional distress and loss of services, in medical malpractice and fraud, based, as the bill of particulars asserts, on the alleged negligent failure to properly "warn, advise [and] inform" the plaintiffs of the risks attendant upon a future pregnancy. These acts were alleged to be wrongful because they were "careless, reckless, heedless and [in] wanton disre-

gard" of the existing state of medical knowledge, under circumstances in which the defendants had an affirmative duty to give accurate medical-genetic advice, and all with subsequent and clearly foreseeable reliance by the plaintiffs, to their detriment. Reducing the amended complaint to elemental terms, the alleged medical malpractice in rendering incorrect medical advice, upon specific direct inquiry, was asserted to be the proximate cause of the injury to the plaintiffs of suffering the needless birth of the genetically deformed child.

Defendants moved to dismiss all eight causes of action based upon this court's rulings in *Stewart v Long Is. Coll. Hosp.* (35 AD2d 531, affd 30 NY2d 695), and *Howard v Lecher* (53 AD2d 420, affd 42 NY2d 109). Special Term dismissed various causes of action for emotional distress and fraud, but denied the balance of the motion and thus preserved the causes of actions to the infant for "wrongful life", and to the parents in medical malpractice for medical expenses and loss of the wife's services. While the plaintiffs have failed to appeal from the dismissal of four of their causes of action, the defendants have appealed from Special Term's preservation of the remaining four causes of action, i.e., the causes of actions to the infant for "wrongful life" and to the parents in medical malpractice for medical expenses and loss of the wife's services.

In my view, Special Term was correct in denying the motion to dismiss those four causes of action.

In *Howard v Lecher* (53 AD2d 420, affd 42 NY2d 109, *supra),* the majority of this court, in recognition of the fact that not all civil "wrongs" can find redress in the law, refused to impose upon all obstetricians the duty of becoming forced genetic counselors. A contrary holding would have compelled all such medical specialists to take lengthy genealogical histories of both parents, whether the patient affirmatively *requested* it or not, whether the medical circumstances indicated *cause* for alarm or not, and all at the inevitable *penalty* of bearing the ultimate legal liability should the infant be born with a genetic deformity. It was the view of the majority of this court in *Howard* that to validate the parents' cause of action, under the circumstances there presented, would make the physician a virtual insurer of the gentic health of newborns, ordinarily a mere fortuitous event. It was decided that no such duty existed between doctor and patient, and hence, in unilaterally seeking to expand the nature of the medical duty owed, the plaintiffs in *Howard* sought to impose an

unwarranted and clearly intolerable burden upon the physician. This was said to be particularly true inasmuch as it is the expectant mother only, and not the father, who occupies the doctor-patient relationship. Yet validating the *Howard* cause of action would nevertheless compel the doctor to take a genealogical history of the nonpatient father, without whose help the physician could not reach any conclusions with respect to future progeny of the patient-wife. In affirming, the majority of the Court of Appeals agreed with the majority of this court, stating essentially that to validate the *Howard* cause of action "would require the extension of traditional tort concepts beyond manageable bounds" *(Howard v Lecher,* 42 NY2d, at p 111) and that the court had always recognized that "the law must establish, circumscribe and limit the rules ascribing liability in a manner which accords with reason and practicality" *(Howard v Lecher,* 42 NY2d, at p 112, citing *Tobin v Grossman,* 24 NY2d 609).

Upon a motion addressed to the sufficiency of a pleading, all of the facts asserted therein must be assumed to be true *(Kober v Kober,* 16 NY2d 191, 193; *Cohn v Lionel Corp.,* 21 NY2d 559, 562). Examined in this light, the facts of the instant case are strikingly different from those in *Howard v Lecher (supra).* Plaintiffs do not rest on what the defendant doctors "should have" done, notwithstanding a failure to actually request it. Plaintiffs here allege that they affirmatively sought a specific medical opinion of the defendants with respect to the risks entailed in having another child with one specific genetic disease, under circumstances in which the defendants knew or should have known that plaintiffs had genuine cause to be concerned, and that they would rely on the superior medical knowledge and advice of the defendants, and, in fact, did rely on that inaccurate advice, leading directly to the birth of another baby with this exact genetic disease.

It is a fixed principle of tort law that, "where a party's negligence is directly responsible for physical injury to another, there is no question but that the injured party may recover both for the actual physical injury sustained and for the concomitant mental and emotional suffering which flow as a natural consequence of the wrongful act" *(Howard v Lecher,* 42 NY2d 109, 111, *supra).* The "physical" injury asserted by plaintiffs here is essentially that the plaintiff wife needlessly suffered the birth of the deformed infant, although it is also

alleged that at the conclusion of the pregnancy, the plaintiff-wife was hospitalized for hemorrhaging prior to the delivery.

■■ The judicial inquiry is whether such conduct by the defendants, wrongful to the plaintiffs, is a wrong which is cognizable at law (see, e.g., *Tobin v Grossman,* 24 NY2d 609, 615). I believe that it is. Clearly, if the allegations are proven, then the defendants were negligent in giving inaccurate medical advice or in failing to ascertain the correct state of medical knowledge to so advise the plaintiffs or both. "While for one to be held liable in negligence he need not foresee novel or extraordinary consequences, it is enough that he be aware of the risk of danger" *(Johnson v State of New York,* 37 NY2d 378, 382). Since the plaintiff wife was the patient of the defendants, and the one to whom a duty of professional medical care was directly owed, it is inconceivable to conclude that the defendants were not "aware of the risk of danger" that false advice would pose (see *Johnson v State of New York, supra,* p 382). The act of giving wrong genetic-medical advice to plaintiffs, who foreseeably would rely on the defendants' superior knowledge, is an "act as to * * * [plaintiffs with] possibilities of danger so many and apparent as to entitle * * * [them], to be protected against the doing of it though the harm was unintended" *(Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 345).

■■ No new duty is imposed on any physician in these circumstances; rather validating the parents' cause of action in the instant case merely extends to a physician a pre-existing duty widely recognized in numerous fields of classic tort law, that one may not speak without prudence or due care when one had a duty to speak, knows that the other party intends to rely on what is imparted, and does, in fact, so rely to his detriment. The injuries that flow therefrom include the economic injuries represented by provable medical and support expenses incurred during the lifetime of the child (see *International Prods. Co. v Erie R. R. Co.,* 244 NY 331; *Ultramares Corp. v Touche,* 255 NY 170). Specifically excluded from recovery under the parents' cause of action, however, are damages flowing from emotional distress, or mental anguish, to the mother, owing to the inability to calculate damages, and the absence of duty (see, e.g., *Howard v Lecher,* 42 NY2d 109, 112, *supra; Tobin v Grossman,* 24 NY2d 609, *supra* and cases cited therein). This reasoning is not unlike that employed by the Fourth Department in *Ziemba v Sternberg* (45

AD2d 230) in upholding an action by a parent against a physician for the negligent failure to diagnose a pregnancy so that the mother was prevented from aborting the fetus within a reasonable time, and more recently in *Karlsons v Guerinot* (57 AD2d 73, 78), in upholding an action quite similar to the one at bar, i.e., against a physician for failure to inform parents of the risks inherent in a second pregnancy with respect to having a deformed child. Validating the causes of action on behalf of both parents, as so limited, would not "inevitably lead to the drawing of artificial and arbitrary boundaries", as it is only the parents, and not any third party, who would foreseeably rely on the advice of the physician whether to have the baby *(Howard v Lecher,* 42 NY2d 109, 113, *supra; cf. Tobin v Grossman, supra).* For these reasons, the first cause of action on behalf of the mother, and the seventh cause of action, on behalf of the father, are valid on their face. Likewise, the fifth cause of action, to the father for loss of his wife's services, is a valid cause of action, as these damages ordinarily flow from the tort (see dissenting opinion of COOKE, J. in *Howard v Lecher, supra,* p 116).

The final question is whether there exists a viable cause of action on behalf of the infant for "wrongful life", the sixth cause of action. The Court of Appeals, in *Howard v Lecher,* has stated (p 112) that the existence of such a cause of action "has not yet been addressed by our court (cf. *Johnson v Yeshiva Univ.,* 42 NY2d 818), nor is it the question now before us."

██ It is commonly said that causes of action for "wrongful life" have not met favor in the courts of this and other jurisdictions (see, e.g., *Karlsons v Guerinot,* 57 AD2d 73, 79-81, *supra; Williams v State of New York,* 18 NY2d 481; *Stewart v Long Is. Coll. Hosp.,* 35 AD2d 531, affd 30 NY2d 695, *supra; Gleitman v Cosgrove,* 49 NJ 22; *Zepeda v Zepeda,* 41 Ill App 2d 240 cert den 379 US 945; see, also, Note, A Cause of Action for "Wrongful Life": [A Suggested Analysis], 55 Minn L Rev 58). Rejection has been based on various theories: from the inability to find that the infant is worse off as a result of the negligence which caused the wrongful life, than had the infant never been born (see *Karlsons v Guerinot, supra,* pp 79-80); to the fact that the fetus could not be legally aborted at the time (see *Stewart v Long Is. Coll. Hosp.,* 35 AD2d 531, *supra);* and to the impossibility of calculating damages *(Gleitman v Cosgrove,* 49 NJ 22, *supra; Williams v State of New*

*York, supra).* But cases are not decided in a vacuum; rather, decisional law must keep pace with expanding technological, economic and social change. Inherent in the abolition of the statutory ban on abortion (Penal Law, former § 125.05; cf. Education Law, former § 6514) is a public policy consideration which gives potential parents the right, within certain statutory and case law limitations, not to have a child. This right extends to instances in which it can be determined with reasonable medical certainty that the child would be born deformed. The breach of this right may also be said to be tortious to the fundamental right of a child to be born as a whole, functional human being. Under the circumstances presented, the portion of the complaint which seeks recovery on behalf of the infant for injuries and conscious pain and suffering caused by defendants' negligence should be permitted to stand. Thus, I consider the sixth cause, asserted on behalf of the child, to state a cause of action.

Accordingly the order appealed from should be modified by granting so much of the defendants' motion as requests dismissal of those portions of the first and fifth causes of action which seek to recover damages (1) for the "mental anguish" or emotional distress of plaintiff Hetty B. Park and (2) for the loss of that plaintiff's services, insofar as the claim for loss of services is based upon her mental anguish or emotional distress.

COHALAN, J. P. (concurring in part and dissenting in part). I would affirm that part of the order of Trial Term, Queens County, which denied, *inter alia,* those portions of the motion of defendants which sought dismissal of (1) the sixth cause of action asserted in the amended complaint and (2) so much of the seventh cause of action as would permit plaintiff Stephen M. Park to recover damages for expenses incurred after the birth of his deceased infant daughter. I otherwise dissent and vote to dismiss the first and fifth causes of action alleged in the amended complaint.

As to the sixth cause of action, I would affirm on the excellent analysis of Mr. Justice HYMAN at Trial Term. As he points out, the action on behalf of the deceased infant is not for "wrongful life", but rather for conscious pain and suffering allegedly caused by the negligence of the defendant doctors. *Howard v Lecher* (42 NY2d 109 [June 16, 1977]) did not decide the question, but remarked that it was still open (see, also,

*Johnson v Yeshiva Univ.,* 42 NY2d 818 [May 12, 1977]). In each of those cases the issue was "wrongful life".

We are concerned here solely with a question of pleading which requires us to accept the factual allegations of the amended complaint as true. Therefore, while *Williams v State of New York* (18 NY2d 481) may be a straw in the wind against the interest of the infant decedent's cause of action, it is not dispositive at bar.

If the sixth cause of action is legally sufficient, then it follows that that part of the seventh wherein the plaintiff father seeks reimbursement for his expenses, is also legally sufficient.

TITONE, J. (dissenting). In my opinion all four causes of action should be dismissed.

In determining that a "viable cause of action" for "wrongful life" exists in this case on behalf of the infant (sixth cause of action), the majority has seen fit to ignore a plethora of judicial precedent to the contrary, not only from other jurisdictions (see, e.g., *Zepeda v Zepeda,* 41 Ill App 2d 240, cert den 379 US 945; *Gleitman v Cosgrove,* 49 NJ 22; *Aronoff v Snider,* 292 So 2d 418 [Fla]; Ann. 22 ALR3d 1441, 1443); but likewise from this State as well (see *Williams v State of New York,* 18 NY2d 481; *Greenberg v Kliot,* 47 AD2d 765, mot for lv to app den 37 NY2d 707; *Stewart v Long Is. Coll. Hosp.,* 35 AD2d 531, affd 30 NY2d 695). "Being born under one set of circumstance rather than another or to one pair of parents rather than another is not a suable wrong that is cognizable in court" *(Williams v State of New York,* 18 NY2d 481, 484, supra).

Lacking judicial precedent, some common-law rule, or a clear statutory promulgation on which to base its conclusion that "wrongful life" should now be accorded judicial approbation, the majority justifies this unwarranted and unprecedented extension of tort liability on a simplistic declaration, to wit: "cases are not decided in a vacuum; rather, decisional law must keep pace with expanding technological, economic and social change." The question which must be posed to the majority at this point is what "expanding, technological, economic and social change" has occurred to justify this startling about-face since this court dismissed a similar cause of action in *Greenberg v Kliot* (47 AD2d 765) on March 17,

1975, and for which leave to appeal was denied by the Court of Appeals (37 NY2d 707) on July 10, 1975.

Manifestly, this is not a question of the court keeping pace with social change, but rather of rushing into the adoption of a radical social concept having no basis in law, namely, that there may be a suable wrong stemming solely from the existence of life.

Moreover, the majority's further reasoning that the cause of action for "wrongful life" emanates from a public policy consideration "inherent in the abolition of the statutory ban on abortion" is equally fallacious. All four causes of action herein in dispute are based not on the mother's right to have an abortion under the "[j]ustifiable abortional act of 1970" (Penal Law, § 125.05, subd 3), but rather upon the right of the parents not to *conceive* another child. It is the understatement of the ages to observe that the choice of parents to conceive or not to conceive antedated the 1970 change in the law prohibiting abortions, and that no right to recover damages for having been conceived and born rather than never to have been conceived or born was known at common law. It should also be noted that the facts set forth in *Greenberg v Kliot (supra)*, in which this court dismissed a related cause of action, occurred after the State Legislature had legalized abortions performed within 24 weeks from the commencement of a pregnancy (Penal Law, § 125.05, subd 3). In fact, the plaintiffs in *Greenberg* specifically argued in their brief that with the advent of the new, liberal abortion law, public policy in this State, which was the *raison d'etre* for the decision in *Stewart v Long Is. Coll. Hosp.* (35 AD2d 531, affd 30 NY2d 695, *supra),* had changed, and thus the cause of action for the child should be sustained. However, this court rejected such argument when it affirmed Special Term's dismissal of the child's cause of action, citing the *Stewart* case.

The holdings in *Greenberg* and *Stewart,* as well as the Court of Appeals' determination in *Williams v State of New York* (18 NY2d 481, *supra),* wherein a cause of action by a child for having been born out of wedlock was dismissed, clearly demonstrate that the public policy of this State favors life over nonlife and birth over nonbirth or nonconception. Programs instituted by concerned individuals and organizations with respect to handicapped, deformed or retarded children do not denigrate or stigmatize those children with the label "unwanted", as pleadings in "wrongful birth" cases often

do, but instead have as their goal the training and encouraging of such children in order to enable them to assume meaningful and important roles in our society. That penal sanctions have been lifted with respect to abortions performed during the first 24 weeks of pregnancy has in no way changed our public policy in this sensitive area. Statutes should not be interpreted so as to declare a radical change in public policy if the language therein used does not manifest the intent that such change is to be effected (*Roberge's Case,* 330 Mass 506). Historically, a cause of action for "wrongful death" (as distinguished from "wrongful life"), was accorded judicial recognition only after it became a creature of a legislative body. By a parity of reason, the same should be true with respect to the concept of "wrongful birth" or "wrongful life". Essentially, a claim for "wrongful death" is based on the premise that a life was terminated which should not have been terminated, whereas a claim for "wrongful life" or "wrongful birth" is predicated on the premise that a life has evolved which should not have evolved.

At common law no civil action would lie for causing the death of a human being. Legislative enactment was the exclusive source and boundary of the liability and the remedy (*Phoenix Ind. Co. v Staten Is. R. Tr. Ry. Co.,* 251 NY 127, 136). The first of the "death acts" took effect in England on August 26, 1846 (9 & 10 Vict, ch 93), and provided that an action would lie against a person only where death was caused by his "wrongful act, neglect, or, default" in a case where such a cause of action might have been maintained by the person injured if death had not ensued. The first "death statute" in this State was enacted in 1847 (L 1847, ch 450) and was almost identical in wording and purpose with the English act (*Greco v Kresge Co.,* 277 NY 26, 32-33).

Today's wrongful death statute (EPTL 5-4.1), effective September 1, 1967, was derived from section 130 of the former Decedent Estate Law (L 1920, ch 919, eff April 15, 1921), which, in turn, was derived from section 1902 of the Code of Civil Procedure. Under section 130 of the Decedent Estate Law and carried over to EPTL 5-4.1, the new and original cause of action which had been legislatively created was based upon the pecuniary injury which the surviving spouse and next of kin suffered by reason of the wrongful act, neglect or default of the defendant.

Thus, it is evident that the right to sue for "wrongful

death", a concept not nearly as controversial as "wrongful life", nevertheless evolved, not through judicial interpretation and extension of judicial precedent, but solely through legislative action. The same is true with respect to other social changes which over the years have had a profound influence on the law of torts, such as workmen's compensation and no-fault insurance. Ramifications stemming from claims for damages for "wrongful life" would be many and multifaceted. Undoubtedly, they would affect drastically not only the doctor-patient relationship, but also the relationship of parent to child and parent to parent. Such questions, I submit, are for sober reflection by a legislative body in the first instance, and not for the courts.

I also disagree both with my colleague, Mr. Justice COHA-LAN, and with Special Term, that the sixth cause of action, asserted on behalf of the child, is not one for "wrongful life", but rather for conscious pain and suffering allegedly caused by the negligence of the defendant doctors. What has been overlooked by both my colleague and Special Term is that this court, on two earlier occasions, dismissed similar causes of action asserted on behalf of a child born with physical defects, on the ground that they were actions for "wrongful birth", even though the pleadings sought damages for physical injury and conscious pain and suffering.

For example, in *Stewart v Long Is. Coll. Hosp.* (35 AD2d 531) the cause of action on behalf of the child for the defendant hospital's failure to bring about a therapeutic abortion of her mother recites, *inter alia:* "That by reason of the premises and the wrongful, unlawful and negligent acts and omissions on the part of the defendant, aforesaid, the plaintiff, Rosalyn Stewart, was rendered *sick, sore, lame and disabled; was seriously and permanently injured; suffers and will continue to suffer agony in body and mind;* was and will be rendered unable to attend to her usual duties and was and will be compelled to secure medical aid and medicines in order to cure or minimize her injuries, all to her damage in the sum of Three Hundred Thousand ($300,000) Dollars" (emphasis supplied).

Moreover, set forth in the bill of particulars on behalf of the child in *Stewart,* was the claim that she was afflicted with cataracts, deafness and congenital heart disease, and that her "mentation * * * will be retarded * * * with respect to *physical and mental disabilities inflicted upon this child by being*

*born* [and] *having been attacked by Rubella while a fetus"* (emphasis and bracketed matter supplied).

Notwithstanding that language clearly alleging pain and suffering by the infant was set forth in her cause of action, this court, in *Stewart,* unequivocally stated, *inter alia:* "We are in agreement with Trial Term that the cause of action by the infant plaintiff for the defendant hospital's failure to abort her mother and thus terminate her life is not cognizable at law". The Court of Appeals affirmed that determination *(Stewart v Long Is. Coll. Hosp.,* 30 NY2d 695, affg 35 AD2d 531).

Also, in *Greenberg v Kliot* (47 AD2d 765), wherein the alleged facts occurred after the State Legislature legalized abortions performed within 24 weeks from the commencement of a pregnancy (see Penal Law, § 125.05, subd 3), the cause of action on behalf of the infant recited, *inter alia,* that because of the failure of the defendant doctor to conduct an "Amniocentesis test" upon the mother to determine whether the unborn child would be normal upon birth, although she requested it, he was caused (1) to be born mongoloid, with internal and external abnormalities, in addition to sustaining damage to his kidneys, and (2) to be rendered *sick, sore, lame* and *disabled,* etc. In the bill of particulars it was alleged on behalf of the infant, *inter alia,* that he was found to be suffering from an enlarged heart, an enlarged liver and the function of only one kidney.

I also come to the conclusion that the causes of action on behalf of the parents seeking damages for pain and suffering, medical expenses incurred on behalf of the child during her life, and for loss of her services and companionship, should likewise be dismissed. Whatever the nomenclature attached to each claim for pleading purposes, be it on behalf of the parents or the child, the indisputable fact remains that each one has as its foundation an assertion that the child, born with polycystic kidney disease, an incurable and ultimately a fatal affliction, (1) should never have been conceived and (2) would never have been conceived had the defendants advised the parents after the death of a previous child at birth from the same disease, that such dreadful malady was congenital and hereditary, and therefore they should consider using means to limit or prevent future conceptions and births.

That such theme permeates throughout all four causes of action is evident from (a) the complaint, wherein it is recited in the first cause of action, and incorporated in all the remain-

ing ones, that the plaintiff mother, relying on the medical advice rendered her by the defendants, became pregnant, resulting in the birth of the child, and (b) the language employed by plaintiffs' attorney in his affirmation opposing defendants' motion to dismiss the complaint, in which he stated, *inter alia:* "Had the parents known of the substantial possibility of this happening [the child being born with poly-cystic kidney disease] *they would not have conceived. * * * As a result of the birth of this diseased infant:* 1) the infant sustained almost constant and untold pain and suffering [sixth cause of action]; 2) the parents suffered untold pain and anguish with the attendant responsibilities of caring for and raising a sick and diseased child, again with catastrophic results on them and the family * * * [first and fifth causes of action]; 3) the parents have incurred tremendous cost and expense for the medical care and treatment of the child [seventh cause of action]" (emphasis and matter in brackets supplied).

Thus, from a close look at exactly what it is the parents are seeking, the conclusion is inevitable that the thrust of their complaint is that they were denied an opportunity to prevent the birth of the child. Reduced further to simplest terms, the basic premise or gravamen of their claims, as well as that of the child, is that the child should never have been born. Essentially, then, they too seek recovery of damages solely because of the existence of life or wrongful life, rather than no life at all. Such suits, as indicated above, are not cognizable at law and have not met favor with the courts (cf. *Williams v State of New York,* 18 NY2d 481, *supra; Rieck v Medical Protective Co.,* 64 Wis 2d 514; Ann. 22 ALR3d 1441, 1443) and, as such, they should await legislative sanction and not be accepted by judicial fiat (see *Stewart v Lond Is. Coll. Hosp., supra;* cf. *Williams v State of New York, supra).*

Furthermore, recognition of the mother's claim seeking damages for personal injury, conscious pain and suffering and reimbursement of expenses incurred by her on behalf of the child would, in my opinion, open the way to the assertion of fraudulent claims and would cause the courts to enter a field having no sensible or just stopping point. If the defendants should respond in damages to her for their alleged failure to advise her against conceiving another child, would it not follow that the informed parent who elects to conceive and

possibly bear a deformed child must then respond in damages to the child on the same underlying theory of "wrongful life"?

Since in my opinion the mother's cause of action for conscious pain and suffering, etc., should be stricken, it follows that her husband's derivative cause of action for loss of her services (fifth cause of action) should also fall. In similar vein, the husband's claim (seventh cause of action) should also have been dismissed.

MARGETT and RABIN, JJ., concur with DAMIANI, J.; COHALAN, J. P., concurs in the denial of the defendants' motion with respect to the sixth and part of the seventh causes of action, but otherwise dissents and votes to grant the defendants' motion with respect to the first and fifth causes of action, with an opinion; TITONE, J., dissents and votes to grant the motion to dismiss the four causes of action in question, with an opinion.

Order of the Supreme Court, Queens County, entered September 27, 1976, modified, on the law, by adding to the fourth decretal paragraph thereof, after the word "denied", the following: "except insofar as the motion requests dismissal of those portions of the first and fifth causes of action which seek to recover damages (1) for the mental anguish or emotional distress of plaintiff Hetty B. Park and (2) for the loss of that plaintiff's services, insofar as the claim for loss of services is based upon her mental anguish or emotional distress, and such portion of the motion is granted." As so modified, order affirmed insofar as appealed from, without costs or disbursements.