**William Randall PHILLIPS, by his Guardian ad Litem, Dwight A. Phillips, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 79–553–8.**

United States District Court, D. South Carolina, Charleston Division.

Dec. 12, 1980.

Ellis I. Kahn, Charleston, S. C., for plaintiff.

Jack L. Marshall, Asst. U. S. Atty., Columbia, S. C., for defendant.

## ORDER

BLATT, District Judge.

This matter is before the court on defendant's motion for summary judgment pursuant to Rule 12(b) and Rule 56(b) of the Federal Rules of Civil Procedure. The action was brought under the Federal Tort Claims Act, and jurisdiction is predicated on 28 U.S.C. § 1346(b). Defendant's motion asserts, *inter alia*, that any failure by defendant's employees in advising, counseling, and testing plaintiff's mother during her pregnancy concerning the risks of Down's Syndrome would not constitute actionable negligence with respect to the plaintiff; that an allegation of "wrongful life"[1] does not state a claim upon which relief can be granted; that plaintiff has not suffered any damage cognizable at law; and that plaintiff does not have standing to maintain this cause of action. Although various other

---

1. A "wrongful life" claim is one "brought on behalf of a severely defective infant, against a physician, . . . contend[ing] that the physician negligently failed to inform the child's parents of the possibility of their bearing a severely defective child, thereby preventing a parental choice to avoid the child's birth." Cohen, *Park v. Chessin: The Continuing Judicial Development of the Theory of "Wrongful Life,"* 4 Am. J.L. & Med. 211, 211 (1979).

> The child does not allege that the physician's negligence caused the child's deformity. Rather, the claim is that the physician's negligence–his failure to adequately inform the parents of the risk–has caused the *birth* of the deformed child. The child argues that *but for* the inadequate advice, it would not have been born to experience the pain and suffering attributable to the deformity.

Comment, *"Wrongful Life": The Right Not to be Born,* 54 Tulane L.Rev. 480, 485 (1980) (emphasis in original). *E. g., Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967). The corresponding action by the parents for damages they may suffer in such a situation is denominated one for "wrongful birth." *E. g., Berman v. Allen,* 80 N.J. 421, 404 A.2d 8 (1979); Trotzig, *The Defective Child and the Actions for Wrongful Life and Wrongful Birth,* 14 Fam. L.Q. 15 (1980). For a complete discussion of the terminological distinctions, see 54 Tulane L.Rev. 480, 483–85 (1980) (including definitions of "wrongful pregnancy" and "dissatisfied life"). See notes 4 and 6, *infra.*

jurisdictions have addressed these issues,[2] this case is one of first impression in South Carolina and its resolution necessitates a careful and circumspect review of both the factual situation and the applicable theories and precedents.

## FINDINGS OF FACT

1. Plaintiff, William Randall Phillips, is the son of Dwight A. Phillips and Kathleen D. Phillips. He was born on September 23, 1977, at the Charleston Naval Regional Medical Center (CNRMC) in Charleston, South Carolina, where his father was on active duty with the United States Navy. It was noted at his birth that plaintiff was afflicted with Down's Syndrome,[3] commonly known as mongoloidism, as well as a moderately loud heart murmur.

2. On August 9, 1976, during a previous pregnancy, plaintiff's mother made her initial visit to the obstetrics clinic at CNRMC. At that time, Mrs. Phillips was in her twelfth week of pregnancy. In completing a prenatal questionaire, she indicated, among other information, that she was twenty–two years of age, that she had not previously borne any children, and that her sister was "mentally retarded." Less than a week later, she experienced an apparent spontaneous abortion, for which she was hospitalized and treated with a therapeutic uterine cervix dilation and curettage.

3. On March 22, 1977, during a subsequent pregnancy, Mrs. Phillips again visited the obstetrics clinic at CNRMC. In responding to a section on the prenatal questionnaire concerning any family history of

**2.** *Gildiner v. Thomas Jefferson Univ. Hosp.*, 451 F.Supp. 692 (E.D.Pa.1978); *Lapoint v. Shirley*, 409 F.Supp. 118 (W.D.Tex.1976); *Smith v. United States*, 392 F.Supp. 654 (N.D.Ohio 1975); *Elliot v. Brown*, 361 So.2d 546 (Ala. 1978); *Curlender v. Bio–Science Laboratories*, 106 Cal.App.3d 811, 165 Cal.Rptr. 477 (Ct.App. 1980); *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689 (1967) (overruled in part by *Berman v. Allen*, 80 N.J. 421, 404 A.2d 8 (1979)); *Becker v. Schwartz*, 60 App.Div.2d 587, 400 N.Y. S.2d 119 (1977), *modified*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Park v. Chessin*, 60 App.Div.2d 80, 400 N.Y.S.2d 110 (1977), *modified sub nom. Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Johnson v. Yeshiva Univ.*, 42 N.Y.2d 818, 364 N.E.2d 1340, 396 N.Y.S.2d 647 (1977); *Karlsons v. Guerinot*, 57 App.Div.2d 73, 394 N.Y.S.2d 933 (1977); *Greenberg v. Kliot*, 47 App.Div.2d 765, 367 N.Y.S.2d 966 (1975) (mem.) (facts summarized in *Park v. Chessin*, 60 App.Div.2d 80, 93, 400 N.Y.S.2d 110, 116–18 (1977) (Titone, J., dissenting)); *Stewart v. Long Island College Hosp.*, 58 Misc.2d 432, 296 N.Y. S.2d 41 (Sup.Ct.1968), *modified*, 35 App.Div.2d 531, 313 N.Y.S.2d 502 (1970), *aff'd mem.*, 30 N.Y.2d 695, 283 N.E.2d 616, 332 N.Y.S.2d 640 (1972); *Speck v. Finegold*, 268 Pa.Super. 342, 408 A.2d 496 (1979); *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975); *Dumer v. St. Michael's Hosp.*, 69 Wis.2d 766, 233 N.W.2d 372 (1975). *See generally* Annot., 83 A.L.R.3d 15 (1978). *See also, e. g., Zepeda v. Zepeda*, 41 Ill.App.2d 240, 190 N.E.2d 849 (1963), *cert. denied*, 379 U.S. 945, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964) (healthy illegitimate child asserting "dissatisfied life" claim); *Williams v. State*, 46 Misc.2d 824, 260 N.Y.S.2d 953 (Ct.Cl.1965), *rev'd*, 25 App.Div.2d 907, 269 N.Y.S.2d 786 (1966), *aff'd*, 18 N.Y.2d 481, 223 N.E.2d 343, 276 N.Y.S.2d

885 (1966) ("dissatisfied life" claim); *Slawek v. Stroh*, 62 Wis.2d 295, 215 N.W.2d 9 (1974) ("dissatisfied life" claim). The issues have also been thoroughly and cogently analyzed by various commentators. *E. g.*, Capron, *Tort Liability and Genetic Counseling*, 79 Columbia L.Rev. 619 (1979); Capron, *Informed Decision Making in Genetic Counseling: A dissent to the "Wrongful Life" Debate*, 48 Ind.L.J. 581 (1973); Cohen, *supra*, note 1; Kelly, *Wrongful Life, Wrongful Birth & Justice in Tort Law*, 1979 Wash.U.L.Q. 919 (1979); Tedeschi, *On Tort Liability for "Wrongful Life,"* 1 Israel L.Rev. 513 (1966), *reprinted* in 7 J.Fam.L. 465 (1967); Trotzig, *supra* note 1; 2 Am.J.Trial Advocacy 107 (1978); 27 Buffalo L.Rev. 537 (1978); 8 Hofstra L.Rev. 257 (1979); 55 Minn.L.Rev. 58 (1970); 10 Seton Hall L.Rev. 952 (1980); 54 Tulane L.Rev. 480 (1980); 55 Wash.L.Rev. 701 (1980).

**3.** Down's Syndrome has been defined by one medical authority as

> a syndrome of mental retardation associated with a variable constellation of abnormalities caused by representation of at least a critical portion of chromosome 21 three times instead of twice in some or all cells; ... the abnormalities include retarded growth, hypoplastic face with short nose, prominent epicanthic skin folds, protruding lower lip, small rounded ears with prominent antihelix, fissured and thickened tongue, laxness of joint ligaments, pelvic dysplasia, broad hands and feet, stubby fingers ... dry rough skin in older patients and abundant slack neck skin in newborn....

Stedman's Medical Dictionary 1382 (4th unabr. lawyer's ed. W. Dornette 1976).

mental retardation, Mrs. Phillips noted that her sister was afflicted with Down's Syndrome. She also indicated that her last menstrual period was December 14, 1976; therefore, at the time of this visit, Mrs. Phillips was approximately fourteen weeks pregnant. She returned to CNRMC on April 17, 1977, and saw Dr. Sadler, who noted that she was in her seventeenth or eighteenth week of gestation and that she reported a family history which included a "sister with Down's Syndrome." Mrs. Phillips was given no further counseling or genetic testing based on this information.[4] The pregnancy culminated with the birth of the plaintiff on September 23, 1977.

4. Although not directly relevant to his "wrongful life" claim, plaintiff's complaint also asserts a distinct cause of action for medical malpractice against defendant's employees at CNRMC based on their alleged failure to diagnose and treat a cardiac disorder in the newborn plaintiff known as "patent ductus arteriosus." In view of the conflicts in the record, the court feels that summary judgment would be inappropriate on this issue.

## CONCLUSIONS OF LAW

[2] Counsel for the respective parties agree that there is no controlling decision in South Carolina governing the novel issues raised by plaintiff's "wrongful life" claim. Under the Federal Tort Claims Act, this court is bound to follow "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b); e. g., Long v. United States, 241 F.Supp. 286 (W.D.S.C.1966);

however, in the absence of such controlling law, this court must attempt to predict the determination that the state Supreme Court would reach on the question. Quinones v. United States, 492 F.2d 1269 (3rd Cir. 1974). A particularly appropriate example of this process, albeit in a diversity context, is provided by Todd v. Sandidge Construction Co., 341 F.2d 75 (4th Cir. 1964), a case arising in the District Court for the Eastern District of South Carolina, in which the Fourth Circuit Court of Appeals correctly anticipated the South Carolina Supreme Court's decision in Fowler v. Woodward, 244 S.C. 608, 138 S.E.2d 42 (1964), by finding that a claim of tortious prenatal injury to a viable fetus did state a cause of action for wrongful death under South Carolina law. Moreover, the state Supreme Court's awareness of the contemporary problems in this area is inferentially supported by language in Baldwin v. Sanders, 266 S.C. 394, 223 S.E.2d 602 (1976), affirming the trial court's refusal to grant a demurrer for failure to state a claim in a "wrongful pregnancy"[5] case. Id. at 397, 223 S.E.2d at 603. In light of the increasing importance of these issues, and their unsettled status in South Carolina, the duty of this court to resolve the issues can only be discharged by a careful survey of the state of the law nationwide, as well as an examination of the theoretical underpinnings of the existing decisions.

As previously noted,[6] eight jurisdictions have considered "wrongful life" claims in approximately twenty reported decisions, with a number of other jurisdictions having considered "dissatisfied life"[7] claims. The

---

4. The primary medical procedure that defendants failed to perform is an amniocentesis test, in which a small amount of the amniotic fluid surrounding the fetus is extracted and analyzed for chromosomal abnormalities. See 2 Am.J. Trial Advocacy, 107, 123–26 (1978).

5. A typical "wrongful pregnancy" claim is one brought by the parents of a healthy, but unwanted, child against a pharmacist or pharmaceutical manufacturer for negligently filling a prescription for contraceptives, or against a physician for negligently performing a sterilization procedure or an abortion. 54 Tulane L.Rev. 480, 483 (1980). E. g., Coleman v. Gar-

rison, 349 A.2d 8 (Del.1975); Troppi v. Scarf, 31 Mich.App.240, 187 N.W.2d 511 (1971).

6. See note 2, supra.

7. A typical "dissatisfied life" claim is one brought by a healthy, illegitimate child, usually against a parent, alleging injury by virtue of his illegitimate status. The leading case is Zepeda v. Zepeda, 41 Ill.App.2d 240, 190 N.E.2d 849 (1963), cert. denied, 379 U.S. 945, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964). In the earlier decisions, these cases were somewhat confusingly denominated "wrongful life" claims. E. g., id. Although the claims involve similar reasoning to some extent, there are also marked dissimi-

overwhelming majority of those cases have refused to recognize the validity of "wrongful life" claims. Although intermediate courts in two jurisdictions have recognized such claims, *Curlender v. Bio–Science Laboratories*, 106 Cal.App.3d 811, 165 Cal.Rptr. 477 (Ct.App.1980); *Becker v. Schwartz*, 60 App.Div.2d 587, 400 N.Y.S. 2d 119 (1977); *Park v. Chessin*, 60 App.Div.2d 80, 400 N.Y. S.2d 110 (1977), the two New York decisions–consolidated for appeal–were reversed by the Court of Appeals of that state in *Becker v. Schwartz*, 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978), and the California decision is still being litigated in that state's courts.[8] All "dissatisfied life" claims have been similarly denied. *E. g.*, *Zepeda v. Zepeda*, 41 Ill.App.2d 240, 190 N.E.2d 849 (1963), *cert. denied*, 379 U.S. 945, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964); *Slawek v. Stroh*, 62 Wis.2d 295, 215 N.W.2d 9 (1974). Thus, the intermediate court's decision in *Curlender* currently stands as the only case recognizing plaintiff's cause of action.[9]

The first reported "wrongful life" case is *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689 (1967). One of the primary factors cited by the court in denying the claim was the difficulty in ascertaining damages.

> The normal measure of damages in tort actions is compensatory. Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence. The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination. This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies.

*Id.* at 29, 227 A.2d at 692. A concurring opinion couches a similar argument in terms of public policy.

> Ultimately, the infant's complaint is that he would be better off not to have been born. Man, who knows nothing of death or nothingness, cannot possibly know whether that is so. We must remember that the choice is not between being born with health or being born without it; it is not claimed that the defendants failed to do something to prevent or reduce the ravages of rubella. Rather the choice is between a worldly existence and none at all. . . . To recognize a right not to be born is to enter an area in which no one could find his way.

*Id.* at 63, 227 A.2d at 711 (Weintraub, C. J., concurring and dissenting). Another widely cited case, *Becker v. Schwartz*, 46 N.Y.2d

---

larities, particularly with respect to the duties and injuries at issue. *See Curlender v. Bio–Science Laboratories*, 106 Cal.App.3d 811, 825, 165 Cal.Rptr. 477, 486 (Ct.App.1980).

**8.** On September 4, 1980, the California Supreme Court denied the hearing requested by the defendants in their petitions from the Court of Appeals' decision. That court had reversed the trial court's granting of defendants' demurrer to the entire complaint, which contained five causes of action; thus, the precise meaning of this denial by the California Supreme Court is unclear.

**9.** Although the Court of Appeals' examination of the issues in *Curlender* is well reasoned, a number of important factual distinctions dilute its relevance here. Most importantly, *Curlender* apparently involves preconception negligence, in that plaintiff's parents retained the

defendants–(a physician and two medical laboratories)–to administer certain genetic tests to determine whether they were carriers of Tay–Sachs disease, an hereditary disease of the nervous system. The defendants' alleged negligence in performing these tests resulted in erroneous information being conveyed to plaintiff's parents concerning their status as carriers. This may have colored the court's analysis of the public policy and damages aspects of the case. Regardless of these differences, this court is not persuaded by the opinion. Although there has been only one subsequent decision in the short time since *Curlender*, that court also declined to adopt the California court's reasoning. *Robak v. United States*, 503 F.Supp. 982 (N.D.Ill.1980).

401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978), utilized similar reasoning.

> Simply put, a cause of action brought on behalf of an infant seeking recovery for wrongful life demands a calculation of damages dependent upon a comparison between the Hobson's choice of life in an impaired state and nonexistence. This comparison the law is not equipped to make. . . . Recognition of so novel a cause of action requiring, as it must, creation of a hypothetical formula for the measurement of an infant's damages is best reserved for legislative, rather than judicial, attention. . . . Accordingly, plaintiffs' complaints insofar as they seek damages on behalf of their infants for wrongful life should be dismissed for failure to state legally cognizable causes of action.

*Id.* at 410, 386 N.E.2d at 812, 413 N.Y.S.2d at 900.

A review of the extant case law reveals a number of recurrent rationales in cases of this type.

### 1. *Ascertainment of Damages*

 This argument first appeared in this specific context in *Gleitman*, 49 N.J. at 29, 227 A.2d at 692, although it had its genesis in *Zepeda v. Zepeda*, 41 Ill.App.2d 240, 190 N.E.2d 849 (1963). While many of the earlier cases adopted the rationale, this court finds such reasoning unpersuasive. If a claim is legally cognizable, mere difficulty in the ascertainment of damages should be insufficient to preclude the action. *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). As one commentator has noted, these damages arguments are "more a matter of policy than logic." Capron, *Tort Liability and Genetic Counseling*, 70 Columbia L.Rev. 619, 648 (1979). Recent cases have been more honest in recognizing this fact. *E. g., Curlender*, 106 Cal.App.3d at 826, 165 Cal.Rptr. at 488–89. *Berman v. Allen*, 80 N.J. 421, 428–29, 404 A.2d 8, 12 (1979) ("Difficulty in the *measure* of damages is not . . . our sole or even primary concern.")

**10.** *See* Annot., 84 A.L.R.3d 411, 432 (1978).

(emphasis in original). Thus, while the argument is relevant to this court's inquiry, it is not determinative.

### 2. *Existence of Duty to Plaintiff*

 Since the modern development of torts *en ventre sa mere, e. g., Bonbrest v. Kotz*, 65 F.Supp. 138 (D.D.C.1946); *Woods v. Lancet*, 303 N.Y. 349, 102 N.E.2d 691 (1951); Annot., 40 A.L.R.3d 1222 (1971), there can be little doubt that, under the proper circumstances, a third party may owe a duty of due care to an unborn child. Prenatal torts of this kind are recognized in South Carolina. *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42 (1964); *Hall v. Murphy*, 236 S.C. 257, 113 S.E.2d 790 (1960). Under *Fowler*, a cause of action for wrongful death exists if, at the time of the negligent act, the fetus is viable, regardless of whether it survives to birth. 244 S.C. at 613, 138 S.E.2d at 44. Since the duty in the case at issue was initially breached at the fourteenth to eighteenth week of gestation, the breach may have occurred at a time when the plaintiff was not viable;[10] however, the technical aspects of viability could be avoided by construing the physician's duty to advise and to test as a continuing or ongoing duty. Again, this court does not view this reasoning, or the concomitant standing arguments, as determinative.

### 3. *Proximate Cause of Injury*

 Earlier "wrongful life" cases frequently advanced a proximate cause argument based on the fact that the negligence of the physician did not cause the genetic defect from which the plaintiff suffered–rather, the negligence was in failing to disclose the existence of the defect. *E.g., Gleitman*, 49 N.J. at 27–28, 227 A.2d at 691–92. However, this argument misinterprets the gravamen of the complaint, which is that the physician's negligence precluded any parental decision to abort the fetus. An alternative of this kind–that is, an eugenic abortion–would certainly appear to fall within the ambit of the Supreme

Court's decisions in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Although the causation issue is less significant in cases involving preconception negligence, as is apparently the case in *Curlender*,[11] this court does not view causation as an insurmountable barrier, even in cases similar to the instant case involving postconception negligence.

### 4. Policy Considerations

The most potent arguments, in this court's opinion, against "wrongful life" claims are predicated on public policy considerations. Although these arguments are phrased in varying terminology–the "impossibility" of determining damages based on a comparison of defective existence with nonexistence, *Gleitman*, 49 N.J. at 29, 227 A.2d at 602, quoting *Tedeschi, supra,* note 1, at 529, the absence of recognized damages, *Berman v. Allen,* 80 N.J. 421, 404 A.2d 8 (1979), the metaphysical, theological, or philosophical nature of the issues, *Becker v. Schwartz,* 46 N.Y.2d 401, 416, 386 N.E.2d 807, 815, 413 N.Y.S.2d 895, 903 (1978) (Fuchsberg, J., concurring); *Johnson v. Yeshiva Univ.,* 42 N.Y.2d 818, 820, 364 N.E.2d 1340, 1341, 396 N.Y.S.2d 647, 648 (1977); *Speck v. Finegold,* 268 Pa.Super. 342, 408 A.2d 496, 509 (1979), the lack of a "justiciable" issue, *Becker,* 46 N.Y.2d at 903, 386 N.E.2d 807, 413 N.Y.S.2d 895 (Fuchsberg, J., concurring), or the absence of a legally "cognizable" cause of action, *Becker,* 46 N.Y.2d at 410, 386 N.E.2d at 812, 413 N.Y.S.2d at 900; *Speck,* 268 Pa.Super.

342, 408 A.2d at 508–they essentially focus on the "preciousness of human life." *Gleitman,* 49 N.J. at 31, 227 A.2d at 693. "One of the most deeply held beliefs of our society is that life–whether experienced with or without a major physical handicap– is more precious than nonlife." *Berman,* 80 N.J. at 420, 404 A.2d at 12. In this court's view, the numerous other policy considerations raised by the cases, such as a substantial increase in litigation, *Stills v. Gratton,* 55 Cal.App.2d 698, 127 Cal.Rptr. 652 (1976); *Park v. Chessin,* 60 App.Div. 2d 80, 400 N.Y.S.2d 110 (1977) (Titone, J., dissenting), a perceived preemption of legislative prerogative in recognizing such new cause of action, *Pinkney v. Pinkney,* 198 So.2d 52 (Fla.App. 1967) ("dissatisfied life" claim); *Becker v. Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Stewart v. Long Island Coll. Hosp.,* 58 Misc.2d 432, 296 N.Y.S.2d 41 (Sup.Ct.1968), *modified,* 35 App.Div.2d 531, 313 N.Y.S.2d 502 (1970), *aff'd mem.,* 30 N.Y.2d 695, 283 N.E.2d 616, 332 N.Y.S.2d 640 (1975), and the possibility of fraudulent claims, *Park v. Chessin,* 60 App.Div.2d 80, 400 N.Y.S.2d 110 (1977) (Titone, J., dissenting); *Rieck v. Medical Protective Co.,* 64 Wis.2d 514, 219 N.W.2d 242 (1974) ("wrongful pregnancy" claim), are merely cumulative to the more fundamental policy already enunciated–the preciousness and sanctity of human life. While scientific and technological advances, together with the changes in moral attitudes that often accompany such advances, may eventually provide a new perspective from which to analyze this position,[12] this court finds it persuasive in the instant case.

---

11. See note 8, *supra.*

12. For example, one could hypothesize a technological breakthrough in genetic engineering, focusing perhaps on the transduction or transformation of chromosomal material through recombinant DNA ("gene–splicing") techniques, controlled mutagenesis, or microsurgery, or in euphrenics, which would allow a particular genetic defect to be treated *in utero* during the early stages of pregnancy. *See* M. Strickberger, Genetics 822 (1968). *See also Diamond v. Chakrabarty,* 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). Thus, "but for" the physician's negligence in failing to detect and treat

the abnormality, the plaintiff could have lived a normal life. Under these hypothetical circumstances, a claim that is currently viewed as one for "wrongful life" involving the comparison of a defective existence to nonexistence begins to exhibit marked similarities to a concededly cognizable cause of action–a tort *en ventre sa mere.*

An interesting contemporary perspective on this public policy consideration is provided by the ongoing diethylstilbestrol (DES) litigation. *E.g., Katz v. Eli Lilly & Co.,* 84 F.R.D 378 (E.D.N.Y.1979); *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980); *Abel v. Eli Lilly & Co.,* 94 Mich.App.

For the foregoing reasons, defendant's motion for summary judgment of plaintiff's "wrongful life" claim is granted, based on the following conclusions: 1) that such a cause of action does not presently exist in South Carolina, and 2) that the South Carolina Supreme Court, if confronted with this issue, would decline, for reasons of public policy, to recognize such an assertion as a legally cognizable cause of action. This determination, however, does not affect plaintiff's alleged claim of medical malpractice against defendant's employees for failure to diagnose his cardiac disorder, which this court explicitly finds to survive this motion, nor does such determination affect any claim that plaintiff's parents may possess.

AND IT IS SO ORDERED.

59, 289 N.W.2d 20 (1980). In contrast to other pharmaceutical product liability cases involving prenatal injuries, such as the thalidomide cases, the damages comparison is rather elusive. With thalidomide, the damages attributable to the drug would be measured by comparing the condition of the plaintiff with the drug–induced defects to his condition had his mother not been prescribed the drug–which, presumably, would be normality. But, with DES, the damages attributable to the drug would be measured by comparing the condition of the plaintiff with the drug–induced carcinoma to her presumed condition had her mother not been prescribed the drug—which, ironically, could be nonexistence, since the drug was prescribed to decrease the incidence of spontaneous abortions in high–risk mothers. Nonetheless, the conceptual difficulties suggested by what is, admittedly, a somewhat artificial and speculative analysis have forestalled neither the measurement nor cognition of damages in these cases.